UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SWEET HARVEST FOODS,<br><br>*Plaintiff*,<br><br>and<br><br>EXPORT PACKERS COMPANY LIMITED, HONEY HOLDING I, LLP DBA HONEY SOLUTIONS, SUNLAND TRADING, INC., NATIONAL HONEY PACKERS & DEALERS ASSOCIATION (NHPDA),<br><br>*Consolidated Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant,*<br><br>and<br><br>AMERICAN HONEY PRODUCERS ASSOCIATION, and<br><br>SIOUX HONEY ASSOCIATION,<br><br>*Defendant-Intervenors.* | Before: Leo M. Gordon, Judge<br><br>Consol. Case No. 22-00188 |

CONSOLIDATED PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

December 19, 2022

Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300
Counsel for Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc.

NON-CONFIDENTIAL VERSION

TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   RULE 56.2 STATEMENT ................................................................. 2

      A.    Determination Under Review ............................................. 2

      B.    Issues Presented ................................................................. 2

            1.    *Is the Commission's affirmative critical circumstances
                  determination with respect to Vietnam not in accordance with
                  law when the agency issued its determination based upon
                  outdated importer and entirely missing end-user inventory data,
                  leading it to be unable to discharge its statutory obligations?* ................ 2

            2.    *Did the Commission fail to support its determination with
                  substantial evidence when it papered over the missing inventory
                  data with assumptions and guesswork?* .................................... 3

            3.    *Did the Commission fail to support its affirmative critical
                  circumstances determination with respect to Vietnam with
                  substantial evidence, when its analysis ignored key arguments
                  raised by Respondents and ignored clearly significant
                  contradictory evidence?* ............................................................ 4

III.  PROCEDURAL BACKGROUND & DETERMINATION UNDER REVIEW ............................... 5

IV.   STANDARD OF REVIEW ................................................................. 8

V.    THE COMMISSION'S CRITICAL CIRCUMSTANCES FINDING REGARDING IMPORTS
      FROM VIETNAM WAS ISSUED DESPITE THE RECORD LACKING EVIDENCE
      REQUIRED TO MEET THE STATUTORY REQUIREMENTS, AND THUS IS
      CONTRARY TO LAW ........................................................................ 11

      A.    The Statute Requires that the Commission Evaluate Both Historic
            Data on Import Levels and Contemporaneous Data on Inventory
            Levels ................................................................................ 11

      B.    Because the Record Contained Outdated Importer and Packer
            Inventory Levels, and Was Entirely Missing End-User Inventory
            Levels, The Record Does Not Support an Affirmative Critical
            Circumstances Finding ..................................................... 13

VI.    **The Majority's Attempts to Paper Over the Missing Inventory Data Relies on Impermissible Assumptions Rather than Record Evidence, and Thus is Unsupported by Substantial Evidence** ........................................................................... 18

      A.    **The Commission's Off-Hand Claims that End-Users Have "Stockpiled" Critical Circumstances Entries Is Pure Guesswork** ................. 18

      B.    **The Commission's Attempts to Shift Responsibility for Missing Inventory Data to Respondents Ignores the Procedural History on the Issue and Ignores Significant, Contradictory Evidence** .................................. 21

      C.    **The Majority's Claim that There Are Inventories Somewhere "In the Supply Chain" That Would "Place Downward Pressure On Prices" Is Based on Guesswork and Ignores Significant Contradictory Evidence** ........ 26

VII.    **THE MAJORITY'S CRITICAL CIRCUMSTANCES ANALYSIS IGNORES KEY, NON-INVENTORY RECORD EVIDENCE** ........................................................................... 29

      A.    **The Majority Ignores Uncontradicted Evidence That Petitioners Shorted Customers Because They Had Insufficient Raw Honey Supply and Could Not Supply Domestic Demand** ............................................ 30

      B.    **The Majority Ignores Uncontradicted Evidence That Any Remaining Inventories of the Critical Circumstances Entries Could Not "Substantially Undermine" the Remedial Effect of the Order Because They Do Not Compete with U.S. Production** ................................................. 33

VIII.    **CONCLUSION** ........................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Altx. Inc. v. United States*,
　25 CIT 1100, 167 F.Supp.2d 1353 (2001) .................................................................28, 33, 35

*Brother Indus., Ltd. v. United States*,
　15 CIT 332, 771 F. Supp. 374 (1991) ...................................................................................28

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*,
　701 F.3d 1367 (Fed. Cir. 2012)..............................................................................................9

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*.,
　467 U.S. 837 (1984)..............................................................................................................12

*China Nat'l Arts & Crafts Import & Export Corp. v. United States*,
　15 CIT 417, 771 F. Supp. 407 (1991) ...................................................................................20

*China Nat'l Mach. Import & Export Corp. v. United States*,
　27 CIT 255, 264 F.Supp.2d 1229, 1240 (2003) ....................................................................21

*CS Wind Vietnam Co. v. United States*,
　832 F.3d 1367 (Fed. Cir. 2016)............................................................................................25

*Dak Americas LLC, et. al v. United States*,
　44 CIT __, 456 F. Supp. 3d 1340 (2020) .......................................................................25, 28

*Elkem Metals Co. v. United States*,
　27 CIT 838, 276 F.Supp.2d 1296 (2003) ............................................................................20

*Gerald Metals, Inc. v. United States*,
　132 F.3d 716 (Fed. Cir. 1997)..............................................................................................10

*Gov't of Arg. v. United States*,
　542 F.Supp.3d 1380 (Ct. Int'l Trade 2021) .........................................................................21

*Greater Boston Television Corp. v. FCC*,
　444 F.2d 841 (D.C. Cir. 1970)..............................................................................................10

*Hebei Metals & Minerals Import & Export Corp. v. United States*,
　28 CIT 1185 (2004) ..............................................................................................................20

*Husteel Co. v. United States*,
　31 CIT 740, 491 F.Supp.2d 1283 (2007) .............................................................................10

iii

*LMI-La Metalli Indus., S.p.A. v. United States,*
    912 F.2d 455 (Fed. Cir. 1990)............................................................................28

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed.Cir.1984)..............................................................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).......................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983).............................................................................................10

*Nippon Steel Corp. v. United States,*
    29 CIT 695, 391 F. Supp. 2d 1258 (2005) (reversed on other grounds).......17, 18, 22

*Rhone-Poulenc Inc. v. United States,*
    20 CIT 573, 927 F. Supp. 451 (1996)....................................................................9

*Sprague Electric Co. v. United States,*
    84 Cust. Ct. 243, 488 F. Supp. 910 (1980), *on reh'g in part* (Cust. Ct. May 23, 1980) ...........9

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    44 F.3d 978 (Fed. Cir. 1994)........................................................................10, 25

*Timken Co. v. United States,*
    10 CIT 86, 630 F. Supp. 1327 (1986) ...............................................................9, 22

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005)............................................................................10

*Universal Camera Corp. v. N.L.R.B.,*
    340 U.S. 474 (1951)..............................................................................10, 25, 32

**Federal Statutes**

19 U.S.C.
    § 1516a(a)(2)(A)(i)(I) .........................................................................................2
    § 1516a(a)(2)(B)(i) *et seq.* ...............................................................................2
    § 1516a(b)(l)(B)(i) ..............................................................................................8
    § 1671d (b)(4)(A)(ii).................................................................................11, 12
    § 1673d(b)(4)(A)(ii).........................................................................8, 11, 12
    § 1673d(b)(4)(A)(ii)(I)......................................................................................11
    § 1673d(b)(4)(A)(ii)(II) ...............................................................................12, 14

**Federal Regulations**

Investigation 701-TA-1564 (Final), *Raw Honey From Argentina, Brazil, India, and Vietnam*, 87
    Fed. Reg. 33,831 (June 3, 2022) .....................................................................2, 6

4864-5736-6853.2

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (June 10, 2022) .................................................................... 2

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (June 10, 2022) .................................................................... 6

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501, 35,502 (June 10, 2022) ........................................... 6

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Determinations*, 87 Fed. Reg. 33,831 (June 3, 2022) ................................................. 6

*Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam*, 86 Fed. Reg. 30,980 (June 10, 2021) ................................................................................................ 5

*Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179 (Apr. 14, 2022) .......................................................................................................... 5, 6

*Raw Honey From Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,531 (Nov. 23, 2021) ......................................................................................... 5

*Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 22,182 (April 14, 2022) .............................................................................. 5

*Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,533 (Nov. 23, 2021) ................................................................. 5

*Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, Fed. Reg. 22,188, and 22,184 ................. 5

*Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,528 (Nov. 23, 2021) ......................................................................................... 5

*Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,530 (Nov. 23, 2021) ......................................................................................... 5

*Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,184 (April 14, 2022) .................................................. 6

v

*Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,526 (Nov. 23, 2021) ....................................................5

*Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,524 (Nov. 23, 2021)............................................................................................5

4864-5736-6853.2

## I.     INTRODUCTION

This Memorandum of Law[1] is filed on behalf of Sweet Harvest Foods ("Plaintiff"), Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc., and is joined by the National Honey Packers & Dealers Association ("Consolidated Plaintiffs") (collectively, "Plaintiffs") in support of Plaintiffs' Rule 56.2 motion for judgment on the agency record.[2] For the reasons set forth below, the critical circumstances determination regarding certain imports of raw honey from the Socialist Republic of Vietnam issued by the United States International Trade Commission is not in accordance with law and is unsupported by substantial evidence. *See* Views of the Commission ("Majority Det."), CR No. 813 (May 31, 2022).  Plaintiffs respectfully request that this determination be reversed and, if necessary, remanded to the Commission.

More specifically, this action challenges the affirmative critical circumstances determination of the majority of the Commissioners regarding raw honey from Vietnam, resulting in the issuance of an antidumping duty order that directed Customs & Border Protection to collect ninety days of additional duties on such entries prior to the suspension of liquidation, as authorized pursuant to section 2411 of the Trade Act of 1974, 19 U.S.C. § 2411. Plaintiffs challenge this determination pursuant to section 516a of the Tariff Act of 1930, which provides that certain final determinations on the record are reviewable by this Court, including affirmative findings of critical

---

[1] Documents in the administrative record are cited using the descriptions provided in the Index in the Court record of this proceeding, submitted by the Commission on September 21, 2022 (Dkt. 21, Sealed Confidential Administrative Record Index, "CR"; Dkt. 22, Public Administrative Record Index, "PR"). Per the instructions of the Court, there are no cross-reference cites to the Joint Appendix that will be submitted by the parties at the conclusion of briefing. Listed page numbers correspond to each individual document's PDF page numbers (and are not additive).

[2] Although all cases concerning the Vietnamese critical circumstances determination are consolidated into a single action, the NHPDA is represented by its own counsel, attorneys from White & Case LLP. The NHPDA supports the arguments made in this Memorandum of Law.

circumstances. 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(i) *et seq*. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which provides jurisdiction over civil actions commenced under 19 U.S.C. § 1516, *et seq*.

## II.      RULE 56.2 STATEMENT

### A.      Determination Under Review

This action is an appeal of the final affirmative determination of critical circumstances by the Commission under 19 U.S.C. § 1673d, as implemented in the antidumping duty order on raw honey from the Socialist Republic of Vietnam. The Commission's Determination regarding imports from Vietnam is issued in Investigation 701-TA-1564 (Final), *Raw Honey From Argentina, Brazil, India, and Vietnam*, 87 Fed. Reg. 33,831 (June 3, 2022). The final antidumping duty order was issued in Dep't of Commerce, *Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Order*s, 87 Fed. Reg. 35,501 (June 10, 2022).

### B.      Issues Presented

Plaintiffs raise three challenges to the Commission's final affirmative critical circumstances determination regarding Vietnam:

> *1.      Is the Commission's affirmative critical circumstances determination with respect to Vietnam not in accordance with law when the agency issued its determination based upon outdated importer and entirely missing end-user inventory data, leading it to be unable to discharge its statutory obligations?*

Yes, the Commission's affirmative critical circumstances determination with respect to Vietnam is not in accordance with law. Even though the statute specifically directs the Commission to evaluate critical circumstances by evaluating inventory levels, the Commission only gathered importer and packer inventory information regarding the imports subject to the critical circumstances review through October of 2021 (six months prior to the conclusion of the investigation

2

and issuance of the order) and failed altogether to gather evidence regarding end-user inventories. The lack of contemporaneous inventory data made it impossible for the Commission to discharge its statutory responsibility to issue an affirmative critical circumstances determination only if the record demonstrated there was a build-up of inventories that would "substantially undermine" the remedial effect of the antidumping duty order. Because the record was missing the required contemporaneous inventory information, there was no basis for the Commission to determine the statutory requirements for an affirmative critical circumstances were satisfied for Vietnamese imports, as explained by the Dissent.

> **2.      *Did the Commission fail to support its determination with substantial evidence when it papered over the missing inventory data with assumptions and guess-work?***

As detailed above, when confronted with a record that contained no evidence to support an affirmative critical circumstances finding for Vietnamese imports, the Commission should have issued a negative critical circumstances determination. Instead, the Commission relied upon unsupported suppositions to fill in the information gaps caused by its failure to gather required information, which is an impermissible basis to find that the high statutory bar that the critical circumstances imports would "undermine seriously" the order was met. The Commission's attempts to evade the necessary implications of the missing inventory data are flatly contradicted by the record and, accordingly, cannot fill in for the missing inventory information. The Majority's affirmative finding accordingly is not supported by substantial evidence.

4864-5736-6853.2

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

3. ***Did the Commission fail to support its affirmative critical circumstances deter-mination with respect to Vietnam with substantial evidence, when its analysis ig-nored key arguments raised by Respondents and ignored clearly significant con-tradictory evidence?***

Yes, the Commission's affirmative critical circumstances determination with respect to Vietnam is not supported by substantial evidence. In reaching its conclusion that critical circumstances existed regarding Vietnam, the Majority's analysis failed to address key evidence in the record that contradicted its affirmative critical circumstances finding, including evidence that the U.S. industry was [ ███████████████████████████████████████ ], was per-forming much better during the same period when the critical circumstances entries were coming into the United States, and the uncontroverted fact that the U.S. suppliers largely cannot even supply competing products to the main consumers of Vietnamese raw honey. In each case, the Majority did not even mention the contrary arguments or this key, non-inventory evidence that contradicted its affirmative critical circumstances finding. Because the Commission must take into account the entire record, including evidence that detracts from or contradicts its findings, and also must take into account and respond to key arguments that run counter to its finding, the Majority determination was unsupported by substantial evidence.

4864-5736-6853.2

### III.   PROCEDURAL BACKGROUND & DETERMINATION UNDER REVIEW

The Petition was filed concurrently at the Commission and the Department of Commerce on April 21, 2021, on behalf of the American Honey Producers Association ("AHPA") and Sioux Honey Association ("SHA"). The Commission initiated investigations 731-TA-1560-1564 to determine whether the U.S. raw honey industry was materially injured by reasons of subject imports from Argentina, Brazil, India, Ukraine, and Vietnam on April 21, 2021. The Commission published its preliminary investigation results on June 10, 2021. *See Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam*, 86 Fed. Reg. 30,980 (June 10, 2021).

The Department of Commerce initiated its investigation on May 11, 2021, and published its preliminary results on November 23, 2021.[3] On April 14, 2022, Commerce published in the Federal Register its affirmative final determinations in the antidumping investigations of raw honey from Argentina, Brazil, India, and Vietnam.[4]

---

[3] *Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,524 (Nov. 23, 2021); *Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,526 (Nov. 23, 2021); *Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,528 (Nov. 23, 2021); *Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,530 (Nov. 23, 2021); *Raw Honey From Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,531 (Nov. 23, 2021); *Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,533 (Nov. 23, 2021).

[4] 87 Fed. Reg. 22,179, *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 22,182 (April 14, 2022), *Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, Fed. Reg. 22,188, and 22,184. *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179

After conducting a hearing and receiving interested-party briefing, on June 3, 2022, the Commission made unanimous determinations that an industry in the United States is materially injured by reason of imports of raw honey from Argentina, Brazil, India, and Vietnam. *Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Determinations*, 87 Fed. Reg. 33,831 (June 3, 2022); Majority Det., CR No. 813 (May 31, 2022). The majority of the Commissioners[5] also found that imports subject to the Department's affirmative critical circumstances determinations "are likely to undermine seriously the remedial effect of the antidumping duty order on Vietnam." 87 Fed. Reg. 33,831 n.3. As a result, certain imports from Vietnam are subject to ninety additional days of retroactively imposed antidumping duties. *See Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501, 35,502 (June 10, 2022).

Commission Chairman David Johanson dissented regarding critical circumstances from Vietnam. Regarding the statutory requirements, Commissioner Johanson noted that the "record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones."

---

(Apr. 14, 2022). Commerce also found the critical circumstances test was satisfied for both Argentina and Vietnam. *See* 87 Fed. Reg. 22,179 and *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,184 (April 14, 2022).

[5] *See Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (June 10, 2022) at 35,502. The Commissioners issuing the affirmative Vietnamese critical circumstances determination are Commissioner Rhonda Schmidtlein, Commissioner Jason Kearns, Commissioner Randolph Stayin, and Commissioner Amy Karpel.

Separate Views of Commissioner David S. Johanson (the "Dissent" or the "Commissioner Johanson Dissent"), CR No. 814, at 9-10 (May 31, 2022). Thus, because "the statute permits an affirmative critical circumstances finding only if the imports subject to the Department of Commerce's critical circumstances determination 'likely' will 'undermine seriously' the order's remedial effect," Commissioner Johanson found that the statutory requirements precluded issuing an affirmative determination. *Id*. at 10.

Commissioner Johanson also carefully worked through the record and determined that the inventory-related evidence before the Commission mandated a negative critical circumstances determination because both supply- and demand-side factors demonstrated that raw honey imports from Vietnam were not in a position to "undermine seriously" the remedial impact of the anti-dumping duty order. The key evidence noted by Commissioner Johanson included record information showing that:

- most of the Vietnamese raw honey imported during the critical circumstances period had been sold off, and thus was not in a position to "undermine seriously" the anti-dumping duty order (*id.* at 4);

- any remaining stocks of Vietnamese raw honey were only a small portion of U.S. apparent consumption (*id.*);

- the impact of the small remaining stocks of Vietnamese raw honey were unlikely to have a major impact given the "substantial increase in apparent consumption" in 2021 (*id.* at 5); and

- declines in U.S. production due to drought conditions in 2021 meant that supplies of raw honey from Vietnam "were being depleted at a greater than ordinary rate." *Id.* at 6.

Commissioner Johanson thus concluded that "while subject imports and importers' inventories of subject imports from Vietnam increased after the petition, much if not all of that buildup had been physically eliminated by the time the order took effect in order to satisfy increased demand and to replace diminished volumes of domestically produced and imported honey." *Id.* at 7.

7

Commissioner Johanson also extensively analyzed the non-inventory evidence regarding the recent performance of the U.S. industry and U.S. market conditions, finding the record also supported a negative critical circumstances determination. In particular, Commissioner Johanson determined that: (1) net sales of the U.S. industry sharply improved between interim 2020 and interim 2021; (2) the "domestic industry's condition has continued to improve since the end of interim 2021"; and (3) "domestic producer' inventories were at the lowest levels on record by the end of 2021." *Id.* at 7, 9. With the U.S industry not producing the type of raw honey needed by large bakers, not being in a position to satisfy overall raw honey demand due to the drought, and with U.S. inventory levels being sharply lower, Commissioner Johanson concluded that for these reasons as well, any remaining inventories of the critical circumstances entries would have no real impact on post-order sales or prices achieved by the U.S. industry. *Id.* at 8-9.

## IV.   STANDARD OF REVIEW

In reviewing the Commission's determination, this Court is required to hold unlawful any determination, finding, or conclusion "found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i).

Regarding the first requirement, the Commission only can issue an affirmative critical circumstances finding if "the imports subject to the affirmative {Commerce critical circumstances} determination ... are likely to *undermine seriously* the remedial effect of the antidumping order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(ii) (emphasis added). Thus, the statute sets a higher standard than for material injury findings, requiring that the extraordinary remedy of imposing duties even before the issuance of any preliminary determinations of dumping or material injury can occur only if the record demonstrates that the specific entries that occurred during the ninety-day

period are "likely to undermine seriously" the antidumping duty order. Majority Det., CR No. 813, at 27, 61-62 (May 31, 2022).

In determining whether this high statutory bar is met, this Court reviews the Commission's opinion "under the arbitrary and capricious (or contrary to law) standard."[6] Furthermore, "{u}nder the Antidumping Act the Commission is charged by Congress with the responsibility for making an investigation, evaluating pertinent economic data bearing upon the question of injury or the likelihood thereof, and making a determination, either affirmative or negative." *Sprague Electric Co. v. United States*, 84 Cust. Ct. 243, 251, 488 F. Supp. 910, 916 (1980), *on reh'g in part* (Cust. Ct. May 23, 1980) (emphasis added).  Because the Commission acts as an independent investigator, and not an arbitrator, the responsibility for gathering information needed to execute its statutory responsibilities is placed on the Commission,[7] especially with regard to gathering evidence that the statute specifically requires the Commission to evaluate.

Regarding the second requirement, the Commission also is required to support its determination with substantial evidence. The standard "requires more than mere assertion of evidence

---

[6] *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). Although the challenge raised by Plaintiffs arises under the contrary to law and substantial evidence prongs, the failure to provide cogent reasoning draws in elements of the arbitrary and capricious standard of review. *Id.* at 1377 (While "the substantial evidence standard applies to review of factual determinations," where "we are evaluating the agency's reasoning . . . {we} review{} under the arbitrary and capricious (or contrary to law) standard.") (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983)).

[7] *Cf. Timken Co. v. United States*, 10 CIT 86, 97, 630 F. Supp. 1327 (1986) ("In certain cases, an agency's failure to collect pertinent data or to consider a relevant aspect of an issue, constitutes an abuse of discretion."). Although this case concerns the Department of Commerce's obligations, the same requirement would apply to the Commission, which also acts as an investigator when evaluating antidumping cases before it. *See also Rhone-Poulenc Inc. v. United States*, 20 CIT 573, 578, 927 F. Supp. 451 (1996).

9

which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (*quoting Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *see Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). In addition, the substantial evidence requires that this Court also ensure that the Commission's determination is "rational," *Gerald Metals*, 132 F.3d at 720 (*quoting Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984)), and that the Commission has taken a "hard look" at all material evidence and "engage{d} in reasoned decision-making." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).

A fundamental requirement under the substantial evidence test is that an "'agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). While Plaintiffs recognize it is not the Court's place to reweigh the evidence, the Court is required to ensure that the Commission has worked through all material record information and provided a cogent rationale within its determination that demonstrates that it has done so, taking into account any material evidence that contradicts its conclusions. Failure to do so mandates reversal, because "{a}n agency's determination is not supported by substantial evidence where the agency fails to adequately explain the basis on which the agency made its decision." *Husteel Co. v. United States*, 31 CIT 740, 748, 491 F.Supp.2d 1283, 1291 (2007) (internal citations omitted).

## V. THE COMMISSION'S CRITICAL CIRCUMSTANCES FINDING REGARDING IMPORTS FROM VIETNAM WAS ISSUED DESPITE THE RECORD LACKING EVIDENCE REQUIRED TO MEET THE STATUTORY REQUIREMENTS, AND THUS IS CONTRARY TO LAW

As noted above, the statute sets a high standard before the Commission can issue an affirmative critical circumstances determination. Such a determination only can be issued if it is "likely" that the remedial effect of the order will be "seriously" undermined. 19 U.S.C. §§ 1671d (b)(4)(A)(ii), 1673d(b)(4)(A)(ii). If the record does not contain information to show that this standard has been met, there is no statutory basis to issue an affirmative critical circumstances finding, because such a determination is both unsupported by substantial evidence and not in accordance with law.

### A. The Statute Requires that the Commission Evaluate Both Historic Data on Import Levels and Contemporaneous Data on Inventory Levels

In evaluating critical circumstances, it is important to note that the inquiry covers a specific set of entries. The issue before the Commission is to consider whether the exact entries of raw honey from Vietnam that entered during the ninety-day critical circumstances period are in a position to "undermine seriously" the remedial effect of the order (hereinafter, the "critical circumstances entries"). Thus, only data that pertains to these specific entries is useful to the analysis. Data that covers imports or inventories of Vietnamese imports in general, or that covers a different timeframe, is of only limited utility, because it includes entries that have no bearing on the analysis.

In making its critical circumstances finding, the Commission is required to make two findings under the statute, each of which lines up with specific evidence that the statute directs the Commission to consider:

First, the Commission is required to evaluate "the timing and the value of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii)(I). This is a historic inquiry, which the Commission generally evaluates by comparing imports over the six months prior to the filing of the petition with the level of

11

imports in the six months afterwards. Plaintiffs do not challenge the Commission's methodology or conclusions relating to whether imports increased.

Second, the Commission is required to determine whether there has been "rapid increase in inventories of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii)(II). This is a forward-looking exercise, as the relevant question set by the statute and the legislative history is for the Commission to determine whether the critical circumstances will be in a position to undermine "any remedial effect of the antidumping {and/or countervailing duty} order{s} to be issued." 19 U.S.C. §§ 1671d (b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

It is the methodology and the determination of the Majority relating to this second statutory requirement that is the subject of this appeal. Merely analyzing whether there is an increase of imports does not complete the analysis; as the statute requires, there also must be evidence to show that those imports would have a specific effect, which is to seriously undermine the remedial effect of the order. Therefore, it could never be legally sufficient to merely find an increase in imports and fail to adduce evidence as to the impact of these imports.  For this reason, the statute requires a second finding regarding the impact of those imports, and goes further to indicate the information (*i.e.*, inventories) that the Commission must analyze. As is well established, where "Congress has directly spoken to the precise question at issue," as it has here, the agency is required to follow that directive. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

For the reasons established in the remainder of this section, the record contains insufficient contemporaneous evidence regarding the levels of critical circumstances entries during the final phase of the investigation. This is because the inventory data regarding the critical circumstances entries for importers and packers only is updated through October of 2021 (*i.e.*, it only covers the preliminary phase of the investigation) and the inventory levels of the critical circumstance entries

for end-users is entirely absent. With the record containing insufficient or entirely missing con-

temporaneous information on inventory levels, there is insufficient record basis to allow the Com-

mission to determine that such entries were in a position to "undermine substantially" the remedial

effect of the antidumping duty order, as the Dissent determined.

### B. Because the Record Contained Outdated Importer and Packer Inventory Levels, and Was Entirely Missing End-User Inventory Levels, The Record Does Not Support an Affirmative Critical Circumstances Finding

As noted above, the statute specifically requires that the Commission evaluate inventory

levels to determine whether there is a sufficient buildup of the inventory of critical circumstances

entries in the U.S. market to "undermine seriously" the remedial effect of the order. In this inves-

tigation, the Commission gathered nearly all of the required import and inventory information right

before the issuance of its Preliminary Determination in November of 2021. This included infor-

mation regarding both the increase in subject imports from Vietnam in the six months prior to the

filing of the raw honey petition in April of 2021, and a comparison period of six months after that

(*i.e.*, to October of 2021), as well as inventory levels for importers and packers for the same period.

Plaintiffs do not dispute that the information gathered during the preliminary investigation

regarding import levels was useful for determining the "timing and value of the imports," as re-

quired by the statute. A somewhat longer time period might have been useful to negate any sea-

sonal factors; however, the collection of data in this timeframe is consistent with how the Com-

mission normally proceeds and is adequate to analyze the retrospective question of whether there

was a surge of imports of raw honey from Vietnam prior to the imposition of provisional measures.

Thus, Plaintiffs do not challenge the conclusion of the Majority to "compare the volume of subject

imports six months prior to the filing of the petitions (November 2020-April 2021) with the volume

of subject imports in the six months after the filing of the petitions (May 2021-October 2021) for

purposes of our critical circumstances analysis in both investigations." Majority Det., CR No. 813, at 67 (May 31, 2022).

The Commission, however, also had a second task before it, which was to consider whether any identified increase in imports would undermine the remedial effect of the order. Here, as noted above, the statute specifically directs that the Commission evaluate inventory levels to answer this question, *i.e.*, to determine whether there has been a "rapid increase in inventories of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii)(II).

The time period to be used in evaluating inventory levels is not specified in the statute. But logically, the entire critical circumstances exercise is intended to determine whether the inventories of critical circumstances entries are large enough at the time of the order that they would "undermine seriously" the remedial effect of that order. If the critical circumstances entries still remain in large quantities at the time of the order, there is a possibility that these entries can satisfy post-order demand, and thus mute the remedial effect of the order.

By contrast, if the entries are entirely or largely consumed, and thus no longer in inventories, then they are not in a position to supplant either sales by U.S. producers or to impact the prices of those sales. Thus, to have a post-import effect, logically, the critical circumstances entries must be in the inventory of the importers, the packers, or the end-users. If there are no or moderate inventories of those entries held by these companies, then the only possibility is that the critical circumstances entries have been completely or mostly consumed, and thus are not in a position to "undermine seriously" the order.

Because the analysis is forward looking – *i.e.*, determining whether any increased critical circumstances imports in inventory at the time of the issuance of the order are in a position to

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

"undermine seriously" the impact of that order – it is necessary for the Commission to have con-temporaneous information regarding those inventory levels. But it is in the discharge of this second statutory task that the Commission erred. As noted above, the Commission's data on inventory levels only went to October of 2021, which is why the Majority's determination conducts its entire analysis based upon outdated importer inventory data. When the Commission summarizes the ar-guments of Petitioners (which it mirrors later in its own analysis), the analysis looks at inventory levels as of September of 2021 – eight months prior to the issuance of the Commission's final determination and the subsequent issuance of the order. *See, e.g.*, Majority Det., CR No. 813 at 63 (May 31, 2022) ("Petitioners argue that importers' inventories of subject imports from Vietnam were [███] percent higher in September 2021 than in September 2020."). Similarly, in its own analysis of inventory levels, the Majority relies on evidence showing inventory levels through October 31, 2021, as well as comparisons of inventory levels in September of 2021. *Id.* at 70-71.

At no point, however, did the Majority analyze inventory levels after October of 2021, let alone inventory levels close to the time when the antidumping duty order would be issued, for the simple reason that the record did not contain such data. This was a critical gap, as imports of raw honey from Vietnam primarily are used by large consumers, such as [████████], which are constantly purchasing and using large amounts of raw honey. *See, e.g.*, [████████] U.S. Pur-chaser Questionnaire Response, CR No. 461 (February 2, 2022). The Majority, however, acts as if the market was static, and any critical circumstances entries that were in inventories in Septem-ber or October of 2021 necessarily were still in inventories six or seven months later.

A further defect in the record is that it does not contain *any* data regarding the level of critical circumstances entries held by end-users. While the record does contain general information regarding inventory levels from end-users, including from Vietnam, there is no data for end-user

inventories specific to the critical circumstances entries. This meant that the record was entirely silent regarding the most important question in this case: whether there were any entries held by end-users available for use after the issuance of the order. Thus, for this reason as well, the record was entirely blank regarding the potential availability of the critical circumstances entries after the issuance of the order and whether they were sufficient to have any impact on U.S. producers.

The combination of the outdated importer and entirely missing end-user inventory data is critical, as illustrated by the following hypothetical:  Suppose that every last ounce of the critical circumstances imports had been sold off by importers and packers to end-users, and that those end-users had used up every purchased ounce, all before the issuance of the order. In these circumstances, it would be impossible for the critical circumstances entries to have any future impact on the market, for the simple reason that they no longer exist. Yet if the Commission were examining a record where importer and packer inventories ended in October of 2021, and where there was no information at all about critical circumstances inventories held by end-users, the Commission would be entirely aware that it was logically impossible to issue an affirmative critical circumstances determination. The fact that such a ludicrous result would be possible demonstrates just how seriously the Majority erred by relying on the outdated and deficient inventory information it considered probative in the final determination.

Thus, the state of the record is missing the exact type of information required to determine the amount of any remaining critical circumstances inventories and whether they were in a position to undermine the remedial effect of the antidumping order. Absent such evidence, there was no basis to issue an affirmative critical circumstances determination, as was cogently explained by Commissioner Johanson in dissent:

> Finally, I note that the statute permits an affirmative finding of critical circumstances only if it is "likely" that the remedial effect of the order will be "seriously"

undermined. In my view, the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition was largely if not entirely eliminated in the next six months before the order, and the domestic industry's condition sharply improved. *The record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones.* While it is possible that enough remained to have an impact, the statute permits an affirmative critical circumstances finding only if the imports subject to the Department of Commerce's critical circumstances determination "likely" will "undermine seriously" the order's remedial effect. Given the evidence in this record, I cannot find that this standard is met.

Commissioner Johanson Dissent, CR No. 814, at 9-10 (May 31, 2022) (emphasis added).

The emphasized conclusion of the Dissent is correct. The test for critical circumstances is necessarily focused on what impact the critical circumstances imports would have *after* the issuance of the order. Because the record contains neither data after October of 2021, nor data regarding the level of critical circumstances entries held by end-users at any point in time, the Dissent correctly stated that "{t}he record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers." *Id.* at 9. With the record entirely silent regarding whether any of the critical circumstances entries were even still present in the market or whether they had been mostly or even entirely consumed, it is impossible to conclude, as required by the statute, that there is record information showing that such imports are in a position to "undermine seriously" the remedial effect of the order.

If the record is lacking information required to show that a statutory requirement is satisfied, then there is no basis to issue an affirmative determination. *Cf. Nippon Steel Corp. v. United States*, 29 CIT 695, 712, 391 F. Supp. 2d 1258, 1275 (2005) ("Thus, in accordance with the statute, in order to find sufficient volume for there to be injury, the {Commission} must identify substantial evidence from the record demonstrating that, should the orders be revoked, it is likely that the

volume of the subject imports entering the U.S. market will be significant.") (reversed on other grounds). Although the *Nippon Steel* case arises in the material injury, and not the critical circumstances, context, as the quoted language states, where the application of the statute requires the existence of certain record evidence, the Commission is required to point to the exact record evidence to show that the statutory command is being followed. Here, the Commission failed to do so, for the simple reason that no such evidence exists on the record. Without an evidentiary basis to support the required second prong of the statutory test, the Commission's affirmative critical circumstances determination was both unsupported by substantial evidence and not in accordance with law.

*          *          *

The statute specifically requires that the Commission evaluate inventory levels as a means of determining whether, at the time of the issuance of the order, there are sufficient levels of the critical circumstances entries in existence to "undermine seriously" the remedial effect of the order. With the record containing no information regarding the inventory levels of the critical circumstances entries at the time of the order, or any information regarding the inventories held by end-users, the Dissent correctly concluded that there was no basis to determine that the statutory standard was met.

**VI.     The Majority's Attempts to Paper Over the Missing Inventory Data Relies on Impermissible Assumptions Rather than Record Evidence, and Thus is Unsupported by Substantial Evidence**

    **A.     The Commission's Off-Hand Claims that End-Users Have "Stockpiled" Critical Circumstances Entries Is Pure Guesswork**

As the Dissent properly determined, with the record missing key inventory information, the Commission had no basis to issue an affirmative critical circumstances determination. But

18

rather than confront the obvious implication of this lacking information, the Majority instead impermissibly tried to fill the record gap with unsupported assertions.

The Majority's *sole* response to the missing inventory data, and the likelihood that the critical circumstances entries likely were sold off into the U.S. market, is as follows: "Respondents argue that importers have now sold off much of their inventory, but *regardless of where the imported honey is in the supply chain*, the *volume associated with these inventories is large* and *increased substantially in the post-petition period* and is *likely to place downward pressure on prices until it is consumed by end users*." Majority Det., CR No. 813, at 73 (May 31, 2022) (emphasis added). *Each* of these italicized statements, however, is an assumption with no basis in the record. In particular:

- First, there is no evidence to support the claim that some or even any of the critical circumstances entries are somewhere "in the supply chain." As noted above, at no point did the Commission request information regarding inventory levels of the critical circumstances entries from end-users. Although the Commission sought information on inventory levels from end-users, the requested information was with regard to general inventory levels, and not the specific inventory levels *of the critical circumstances entries* – the only end-user inventory data that bears on the critical circumstances issue. With the record missing data to support a critical circumstances finding, the Majority is not allowed to instead rely on an unsupported assumption that the critical circumstances imports were still in the hands of end-users and not already used to fill in the gap. Majority Det., CR No. 813, at 73-74 at n. 306 (May 31, 2022).

- Second, there is no basis for the Commission to claim that any remaining inventories of the critical circumstances raw are "large." Because there is no information regarding how much raw honey was not consumed at the time of the order – let alone any evidence to suggest that the amount is "large" – the Commission once again is relying on supposition where it is supposed to be relying on evidence. *Id.* at 73.

- Third, it is impossible to say whether the level of inventories *of the critical circumstances entries* had "increased substantially in the post-petition period," for the simple reason that the information collected by the Commission regarding the level of critical circumstances inventories ends as of October 31, 2021 (and was entirely absent for end-user critical circumstances inventories). Further, as the Dissent notes, to the extent that inventories of raw honey from Vietnam increased *after* the imposition of provisional measures, such increases would have no bearing not only because they are not "critical circumstances entries," but also because they would have paid all provisional measures,

and hence by definition are fairly traded. Commissioner Johanson Dissent, CR No. 814, at 3-4 (May 31, 2022).

- ▪ Fourth, as detailed more fully below, the Majority fails to take into account that the NHPDA Post-Hearing Brief attempted to fill in the gap regarding the inventory data that the Commission did not collect by itself submitting critical circumstances inventory information that went through March of 2022. *See* NHPDA Post-Hearing Brief, CR No. 788, at Ex. 4 (April 19, 2022). But instead of relying on this information, which was close to contemporaneous, the Commission instead continued to rely on inventory levels that ended as of October 2021. Majority Det., CR No. 813 at 72-74 (May 31, 2022). Between the Commission gathering no information on the critical circumstances entries held by end-users, as well as its insistence on looking at data that was more than six months out of date (even though updated information was available), the Commission was left with a hopelessly confused determination based on missing and outdated data, all while ignoring material inventory information that was placed before it.

- ▪ Fifth, it is impossible to conclude that any remaining inventories are "likely to place downward pressure on prices until it is consumed by end users," for the simple reason that it is entirely unknown, based on the record, whether the critical circumstances entries are already consumed or, if not, whether the amount of such entries is sufficiently large to place downward pressure on prices. Majority Det., CR No. 813, at 73 (May 31, 2022). As is detailed in the next section, entries that were already consumed, by definition, cannot be exerting future downward pressure on prices.

In short, rather than confront the lack of record evidence on the key inventory levels that the statute requires the Commission to evaluate, the Majority instead relies on unsupported assumptions and guesswork to fill in the gap for the missing evidence. But as this Court has stated, mere assumptions, without supporting facts in the record, do not satisfy the "substantial evidence" test, and cannot take the place of a well-reasoned determination supported by the evidence in the record. *China Nat'l Arts & Crafts Import & Export Corp. v. United States*, 15 CIT 417, 419-423, 771 F. Supp. 407, 410-13 (1991); *see Elkem Metals Co. v. United States*, 27 CIT 838, 859, 276 F.Supp.2d 1296, 1315 (2003) ("The substantial evidence standard was developed to avoid…arbitrary uses of discretion. Guesswork is no substitute for substantial evidence in justifying decisions."). Simply stringing together a series of unsupported assumptions and putting it forth as fact violates the substantial responsibilities placed on the Commission, and therefore must be reversed, because "'{c}onjectures are not facts and cannot constitute substantial evidence.'" *Hebei Metals*

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*& Minerals Import & Export Corp. v. United States*, 28 CIT 1185, 1207 (2004) (*quoting China Nat'l Mach. Import & Export Corp. v. United States*, 27 CIT 255, 268, 264 F.Supp.2d 1229, 1240 (2003)); *accord Gov't of Arg. v. United States*, 542 F.Supp.3d 1380, 1396 (Ct. Int'l Trade 2021) (It is well established that an agency "may not base its conclusions on speculation.").

Putting these points together, the only possible conclusion is the one reached by the Dissent, which states: "{t}he record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones." Commissioner Johanson Dissent, CR No. 814, at 9-10 (May 31, 2022). With all of this information lacking in the record, there is no support for the Majority's determination that end-users have supposedly "stockpiled" critical circumstances entries.

**B.    The Commission's Attempts to Shift Responsibility for Missing Inventory Data to Respondents Ignores the Procedural History on the Issue and Ignores Significant, Contradictory Evidence**

Rather than confront the necessary implications of the lacking support for its critical circumstances conclusion, the Commission instead attempts to wave away the absence of evidence in this one sentence: "As to raw honey held downstream, we note that the Ingredient Purchasers fully participated in the final phase of these investigations, yet [ █████████████ ██████████████████████████ ██████████████████████████████████ ], one of the Ingredient Purchasers who participated in the final phase of these investigations." Majority Det., CR No. 813, at 74, n. 306 (May 31, 2022).

But this attempt to place responsibility for the deficient information on one particular interested party type suffers from three separate errors.

First, and most fundamentally, it turns the role of the Commission on its head. The statute expressly directs that the Commission must evaluate inventory levels as a means of determining whether critical circumstances exist. Further, the only logical interpretation of the statute is that, because the analysis of inventory levels is solely concerned with whether those inventories of critical circumstances entries will have a post-order impact, that information should be complete (*i.e.*, include both importer and end-user inventory levels) and also contemporaneous (as required to determine whether those inventories are still in existence, so that the Commission can determine whether those inventories are in a position to "undermine substantially" the remedial effect of the order. With the statute placing the responsibility on the Commission to evaluate this data, it is unavailing for the Majority to disclaim responsibility for gathering the very evidence that the statute directs it to evaluate. *Cf. Timken Co.*, 10 CIT at 97.

Further, the Commission is required to base its determination upon the record before it. If the Commission cannot "identify substantial evidence from the record demonstrating that" the statutory test is met, then the Commission must issue a negative determination. *Nippon Steel Corp.*, 29 CIT at 7121. If such evidence does not exist, then the only valid conclusion, as determined by the Dissent, is to conclude that, "{g}iven the evidence in this record," the statutory standard has not been met. Commissioner Johanson Dissent, CR No. 814, at 10 (May 31, 2022).

Second, the Majority's blithe attempts to assert that there was a supposed failure of the end-users to put their inventories on the record ignores the procedural history on this issue. At no point in the preliminary phase of the investigation, or, indeed, well into the final phase, was the question of whether end-users were supposedly "stockpiling" critical circumstances entries raised.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

It was only at the time of the Pre-Hearing Brief – right before the hearing – that Petitioners inserted this allegation into the record.

Not only was the allegation raised extremely late in the investigation, it also was raised in a hopelessly confused fashion. The allegation submitted by Petitioners of supposed "stockpiling" of critical circumstances entries was found entirely in a single affidavit attached to Petitioners' Pre-Hearing Brief, which claimed (without support) that [ ██████████████████████████ ██████████████ ] to inventories held by a single importer. Petitioners' Pre-Hearing Brief, CR No. 746 at 109-110 and Ex. 4, para. 24 [ ████████████████ ] (April 5, 2022). But in an obviously discernible sleight of hand, Petitioners' counsel took this claim that an *importer* suppos-edly was "stockpiling" critical circumstances inventories to support a claim that the *end-user* [ ██████████ ] was "stockpiling" those entries. Petitioners' Post-Hearing Brief, CR No. 781 at 14 (April 19, 2022).[8]

Petitioners' counsel, in other words, deliberately twisted an affidavit claiming stockpiling by an importer to state the opposite – that the importer had in fact sold off its imports and that an entirely different company was now sitting on those inventories. The Dissent correctly summarized the actual contents of the affidavit as follows:

> According to Petitioners' prehearing brief, [ ████████████████ ████████████████ ████████████████ ]

---

[8] The Declaration by [ ██████████ ] claimed [ ████████████████ ████████████████████ ] and that [ ████████████████ ]. Petitioners' Pre-Hearing Brief, CR No. 746 at 109-110 and Ex. 4, para. 24 [ ████████ ██████ ] (April 5, 2022). This statement was then re-written by Petitioners–and accepted by the Majority–to mean that [ ██████████ ] itself stockpiled Vietnamese honey. Petitioners' Post-Hearing Brief, CR No. 781 at 14 (April 19, 2022) ("Indeed, [ ████████████████ ██████████ " ]. emphasis added.) There is no support in the Declaration, or elsewhere in the record, for this rewriting of the affidavit.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

[ ███████████████████████ ]. In their posthearing brief, Petitioners inti-mated that this honey may be [ ██████████████████████ ]. *Yet, the dec-larations that Petitioners supplied to support their assertions instead attest only that [ ████████████████████████████████████████████████████████████ ██████████████████████ ]. That does not support that [ ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████ ]*.

Commissioner Johanson Dissent, CR No. 814, at 3 (May 31, 2022) (footnotes omitted).

Thus, the sole record support for the supposed claim of end-user "stockpiling" was not credible on its face. There was no way to anticipate that the Commission would take this evidence seriously, as it was based upon a complete misrepresentation of the affidavit by Petitioners' coun-sel, let alone to guess that the Majority would elevate this brazen misreading of the record into the linchpin of claim of supposed end-user "stockpiling" or its claim that the critical circumstances entries were somehow "in the supply chain." Majority Det., CR No. 813, at 73 (May 31, 2022)

Third, the Majority also ignores that, despite the late timing of Petitioners' allegation, Re-spondents *did* reply to the confused allegations of supposed "stockpiling," providing both logical reasons why the claim was contrary to the data as well as additional inventory data to refute the claim. The importers and packers submitted a Critical Circumstances Appendix to the NDHPA Post-Hearing Brief, which specifically presented importer and packer data regarding inventories through March 2022. NHPDA Post-Hearing Brief, CR No. 788, at Ex. 3 (April 19, 2022). As evidenced by Exhibit 3-A of that submission, the detailed inventory data from these large importers and packers demonstrates that Vietnamese imports from [ ███████████████ ] importers decreased by [ ██████ ] from [ ████████████████████████████ ]. *Id*. at Ex. 3-A.  The [ ██████ ] packers also noted a [ ██████ ] decrease over the same time period. *Id*. at Ex. 3-B.

This was the *only* record evidence that was contemporaneous and bore directly on the ques-tion of whether there were likely inventories of critical circumstances entries that could potentially

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

"seriously undermine" the remedial effect of the order. The fact that every importer, and most packers, saw their inventory of Vietnamese honey substantially decrease from [ ███████████ ████████████ ] provides contemporaneous evidence supporting exactly what the importers, packers, and end-users were informing the Commission, which is that the overwhelming majority of the critical circumstances entries were sold off *and consumed* prior to the issuance of the order. *Id.* at Ex. 4.

Under the substantial evidence standard, the agency must "must take into account whatever in the record fairly detracts from its weight," *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016), including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A.*, 44 F.3d at 985 (*quoting Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487 (1951)). For the Commission to ignore this contemporaneous evidence, in favor of outdated information that only went to October of 2021, is inexplicable.

This Court has previously determined that "{a}n agency determination may not be sustained without considering 'contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Dak Americas LLC, et. al v. United States*, 44 CIT __, 456 F. Supp. 3d 1340, 1352 (2020) (*citing Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487 (1951)). In line with such precedent, the Court should find here the agency determination cannot be sustained, as the Majority did not sufficiency consider "contradictory evidence."

25

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

**C.     The Majority's Claim that There Are Inventories Somewhere "In the Supply Chain" That Would "Place Downward Pressure On Prices" Is Based on Guesswork and Ignores Significant Contradictory Evidence**

Rather than evaluate the updated importer and packer inventory data placed on the record, the Majority instead compounds its error of assuming that the end-users were holding large inventory of critical circumstances entries by also asserting that these entries were in a position to exert "downward pressure on prices." Majority Det., CR No. 813, at 73 (May 31, 2022). As the Majority summarized the claim: "Respondents argue that importers have now sold off much of their inventory, but regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users." *Id.*

As detailed above, the claim of supposed end-user inventory hoarding has no record basis. The same is true of the claim that any end-user inventories of the critical circumstances entries will "place downward pressure on prices until it is consumed." *Id.*

The entire allegation of supposed downward price pressure is premised on a very specific claim advanced by Petitioners, which is that [ ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ].

Petitioners' Post-Hearing Brief, CR No. 781, at Ex. 1 at 34, 39 (April 19, 2022) (stating that "the record contains evidence that [ ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ]."). Thus, the entire basis for the claim that there are "large" end-user inventories in a position to push post-order prices down flows back to this single claimed set of imports of [ ██████████ ] pounds of raw honey, occurring in a single month, all by a single importer. Majority Det., CR No. 813, at 63 (May 31, 2022).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Given that this was the sole support for the Majority's claims of supposed end-user "stock-piling," one would think that the Commission would have dealt with the response provided by Respondents, which showed the logical impossibility of this importer front-running the provisional measures. As Respondents stated:

> This allegation of a massive [███████████████████████████ ], however, is contradicted by the record. Commission staff gathered information on individual company imports from Vietnam during the interim (Q1 through Q3) period. As shown in the [ ████████ ] importer questionnaire response, the total amount of imports by [ ████████ ] over the entirety of these three quarters – which includes [ ████████ ] – was [ ██████████ ].
>
> *Given that [ ████████████████████████████████████████████████████████████████████████████████████ ] rings hollow*. For Petitioners' claim to be true, it would necessarily mean that [ ████████████████████ ], and then abruptly turned on a dime and imported [ ████████████████ ]. There is no rational basis why any importer would engage in this pattern of imports, especially since the imports in Q1 and Q2 were not only clear of any provisional measures, but in fact were made during the period that cannot be reached by any critical circumstances period.
>
> Further, Petitioners entirely ignore the evidence showing that during the prior 2020 interim period, over the same three quarters, [ ██████████████████████ ] pounds of raw honey. *In other words, far from showing a supposed massive ramp-up in imports, the record instead shows that [ ████████████ ] imported basically the same amount of raw honey from Vietnam in interim 2021 as it did in interim 2020. Thus, far from showing a claimed ramp-up of imports, the record instead shows a similar import pattern for the prior year.*

NHPDA Final Comments, CR No. 811, at 14-15 (May 6, 2022) (emphasis added) (footnotes omitted).

Thus, the affidavit's fanciful claim of supposed end-user hoarding was entirely refuted – both by considering the lack of any increase in imports over the prior year, as well as the logical impossibility of the claim of a supposed [ ██████████ ] pound surge. Yet the Majority did not even acknowledge that these arguments were presented to it, let alone respond to them in the final determination.

27

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

It is well established that the Commission is required to deal with major arguments raised by the parties, as well as to consider significant evidence that contradicts its conclusion. *See, e.g. Dak Americas LLC*, 44 CIT at __, 456 F. Supp. 3d at 1352; *Altx. Inc. v. United States*, 25 CIT 1100, 1103, 167 F.Supp.2d 1353, 1359-60 (2001). For this reason, as well, the speculative claim of the Majority of supposed end-user "stockpiling" should never have seen the light of day, because it is logically impossible and has no support in the record. *See LMI-La Metalli Indus., S.p.A. v. United States*, 912 F.2d 455, 459-60 (Fed. Cir. 1990) (once evidence has been produced to counter a presumption, an agency can no longer cling to it because an agency's "speculation…must yield to evidence"); *Brother Indus., Ltd. v. United States*, 15 CIT 332, 339, 771 F. Supp. 374, 382 (1991).

With there being no support for the claim that [ ▮▮▮▮▮▮ ] has been stockpiling the critical circumstances entries, the Majority instead should have analyzed the record regarding the level of inventories of the main supplier to [ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ]. This supplier provided contemporaneous inventory data up through March 2022. This data, however, sharply contradicts the claim of the Majority that there was any "stockpiling" of the critical circumstances entries. As the Dissent states:



> Recent inventory figures for [ ▮▮▮▮▮ ] are on the record. It reported that it possessed [ ▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮ ]. [ ▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮ ].
>
> I do not find that the existence of the remaining [ ▮▮▮▮▮ ] inventories in themselves is likely to undermine seriously the remedial effect of the order for two reasons. {T}he [ ▮ ] million pounds of honey from Vietnam that [ ▮▮▮▮▮ ] had in stock at the end of the first quarter of 2022 equaled only [ ▮ ] percent of U.S. apparent consumption in 2021.

Commissioner Johanson Dissent, CR No. 814, at 3-4 (May 31, 2022).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

In short, the record demonstrates that the overwhelming majority of the critical circumstances entries imported by [ ████████████ ] were sold off by the time of the order, just as the Commission was informed in testimony. *See* NHPDA Post-Hearing Brief, [ ████████ ████ ], CR No. 788 at Ex. 1 at para. 9 (April 20, 2022) ("Due to a combination of these two factors, our inventories of raw honey from Argentina and Vietnam that arrived prior to the imposition of the provisional measures for these imports are mostly sold off."). The record also provides not a shred of support for the claim that there was a surge of imports [ ████████ ████████ ], let alone that these imports are "somewhere in the supply chain" and therefore in a position to put "downward pressure on prices." Majority Det., CR No. 813, at 73 and n. 305 (May 31, 2022). Further, the Majority ignores that the same importer provided sworn testimony and an affidavit directly refuting these unsupported claims. In these circumstances, the Majority's conclusion that there is an inventory of critical circumstances entries somewhere "in the supply chain" that are in a position to put "downward pressure on prices" has no support in the record.

## VII.   THE MAJORITY'S CRITICAL CIRCUMSTANCES ANALYSIS IGNORES KEY, NON-INVENTORY RECORD EVIDENCE

As established in Part VI, the Majority's affirmative critical circumstances determination relies on guesswork and assumptions to paper over the outdated importer and non-existent end-user inventory levels for the critical circumstances entries, which makes its determination contrary to law and deprives it of the necessary substantial evidence foundation required to meet the statutory standard. In addition to these failures (which merit reversal in and of themselves), the Majority also erred by entirely ignoring two other key pieces of evidence:  (1) information demonstrating that the U.S. industry was experiencing severe shortages and the inability to supply customers at the end of the period of investigation; and (2) information demonstrating that the U.S. producers, which do not make raw honey that directly competes with the Vietnamese imports, would not be

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

losing any sales opportunities at the bakers who rely on Vietnamese imports. In both cases, this obviously material evidence was not even mentioned by the Majority, providing further proof that the Majority's determination was unsupported by substantial evidence.

### A. The Majority Ignores Uncontradicted Evidence That Petitioners Shorted Customers Because They Had Insufficient Raw Honey Supply and Could Not Supply Domestic Demand

The entire purpose of the critical circumstances determination is to determine whether there are sufficiently large inventories of subject merchandise, entering prior to the imposition of provisional measures (and thus subject to no antidumping duties), to show that it is "likely" that those exact entries will undermine the remedial effect of the antidumping duty order. The analysis, in other words, is all about discerning whether those exact entries are in a position either to displace U.S. sales or to undercut them on price.

In light of this goal, it is critical to examine whether the U.S. industry is awash in unsold product (which would make it more "likely" that it would lose sales to any remaining critical circumstances entries, and thus push the Commission towards issuing an affirmative critical circumstances determination) or, in the alternative, is experiencing shortages (which pushes in the opposite direction). Yet the Majority does not even look at this evidence, even though it is plainly material to the consideration of critical circumstances.

If it had, the Commission would have seen that the U.S. industry was, by the time of the final phase of the investigations, experiencing severe shortages. As the Staff Report notes:

> When asked about supply constraints after the filing of the petition on April 21, 2021, 6 U.S. producers and 14 importers reported that they refused or declined to supply due to adverse climate conditions and increased logistics costs and delays. *Fifteen of 20 responding purchasers reported being declined supply after the filing of the petition citing* [ █████████████ ] *inability to supply dark amber honey,* COVID-related disruptions such as logistics, labor shortages, and lockdowns, and uncertainty in the market resulting from the petition. *Four purchasers reported that* [ ███████████ ] *declared a force majeure and was unable to fill orders in 2021.*

30

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Purchaser [ ██████ ] reported that following the filing of the petition, suppliers have been unable to provide reliable or consistent "forward" pricing which has led to supply constraints.

Pre-Hearing Staff Report, CR 744 at II-9 (March 29, 2022).

Further, this information was amply corroborated in the questionnaire responses. [ ████

██████ ], for example, one of the largest bakers and consumers of raw honey in the United States,

reported in its questionnaire response that [ ████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ ]. [ ███████████ ]

U.S. Purchaser Questionnaire, CR No. 509 at p. 26, III-13 (February 3, 2022). [ ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ ]. *Id.* Similarly, at the hearing, the

representative from Post Holdings described a similar experience with Sioux Honey (Hearing

Transcript, PR 195 at 201:8-16 (June 17, 2022)), including multiple experiences, in July and No-

vember of 2021, where it was told by Sioux Honey that no raw honey was available for purchase.

*Id* at 201:8-16, 255-56:25-6.

Further, it is likely that these shortages will continue after the order. As the Dissent noted,

"domestic honey yields in 2021 were much lower than in previous years for reasons largely unre-

lated to subject imports," primarily due to the ongoing drought. Commissioner Johanson Dissent,

CR No. 814, at 8 (May 31, 2022). Further, as the Dissent also notes, "domestic producers' inven-

tories were at the lowest levels on record by the end of 2021." *Id.* at 9. Thus, the shortages not only

were widespread, but likely to continue.

These widespread examples of shortages have two obvious implications for the critical

circumstances inquiry. First, if the U.S. industry is having shortages of raw honey and has record-

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

low inventories of raw honey, then the likelihood of any remaining inventories of the critical circumstances entries having any type of impact on the U.S. industry is far smaller. Thus, the fact that the [ ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████ ], is material information that the Commission should have considered. *See, e.g.*

[ ███████████ ] U.S. Purchaser Questionnaire, CR No. 509 at p. 26, III-13 (February 3, 2022).

But even beyond this point, the shortages also support the statements of the importers and end-users that the critical circumstances entries were largely or completely sold off. As the Dissent notes:

> A majority of purchasers (15 of 20) reported that suppliers declined to supply them following the filing of the petition, while six U.S. producers and 14 importers reported refusing to supply purchasers during that period. When purchasers could not get sufficient supply after the petition was filed, they would have drawn down their own stockpiles.
>
> Thus, while subject imports and importers' inventories of subject imports from Vietnam increased after the petition, much if not all of that buildup had been physically eliminated by the time the order took effect in order to satisfy increased demand and to replace diminished volumes of domestically produced and imported honey.

Commissioner Johanson Dissent, CR No. 814, at 7 (May 31, 2022).

Thus, for both of these reasons, the information regarding U.S. industry shortages, as well as the record-low inventory levels, was material. Yet the Majority does not even mention, let alone take into account, this obviously material information.

As detailed above, the Commission is required under the *Universal Camera* standard to take into account all information in the record, including that which contradicts its findings, and to provide the reviewing court with sufficient analysis to show that it has discharged this basic substantial evidence responsibility. This is especially true when the contradictory information is laid out in the Staff Report. As this Court has stated, "whatever discretion the Commission may

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

have to reject deliberately the conclusions found in the agency's Staff Report … it may not through

its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclu-

sions where an interested party has specifically brought the possibly conflicting evidence to the

agency's attention." *ALTX, Inc.,* 25 CIT at 1103. Thus, the failure of the Majority to take into

account this highly relevant U.S. producer shortage and inventory information provides further

evidence that the Majority's analysis is unsupported by substantial evidence.

### B.   The Majority Ignores Uncontradicted Evidence That Any Remaining Inventories of the Critical Circumstances Entries Could Not "Substantially Undermine" the Remedial Effect of the Order Because They Do Not Compete with U.S. Production

The second non-inventory evidence that the Majority ignored was the sharp differences in

use of U.S. and Vietnamese raw honey. This is material to the critical circumstances question

because the more substitutable the two types of raw honey are, the more the Commission is pushed

in the direction of an affirmative critical circumstances, because this would increase the likelihood

that any remaining inventories of the critical circumstances entries would replace U.S. sales. By

contrast, evidence that the two products are not particularly interchangeable would lead to the

opposite conclusion.

Here, the record establishes that the latter situation prevails. As is established throughout

the record, Vietnamese raw honey has different uses than U.S.-produced raw honey, which largely

relegate them to different end uses. In 2020, approximately [ ▮▮ ] percent of Vietnamese imports

are light amber or amber or darker honey. Pre-Hearing Staff Report, CR No. 744 at E-9 (Table E-

6) (March 29, 2022); NHPDA Pre-Hearing Brief, CR No. 747, at 55, n. 214 (April 5, 2022). This

type of honey is most commonly used in the ingredient segment of the market, as it retains its

honey flavor throughout the baking, cooking, or production process. *See*, *e.g.*, [ ▮▮▮▮▮ ]

U.S. Purchaser Questionnaire Response, CR 461 (February 2, 2022). In direct contrast, in 2020,

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

only [ ██ ] percent of U.S. production accounted for amber and dark amber honey. *See* Pre-Hearing Staff Report, CR 744, at E-4 (Table E-1) (March 29, 2022); NHPDA Pre-Hearing Brief CR No. 747, at 47, 54 (April 5, 2022).

The sharp specialization of the two countries in different forms of raw honey, which are suitable for entirely opposite uses, mutes the impact that any remaining critical circumstances inventories would have on the U.S. industry. This point is well summarized by the Dissent, which uses the example of [ ████████ ] to illustrate why any remaining inventories of the critical circumstances entries are unlikely to have an impact on the U.S. industry after the issuance of the order:

> Second, even if these inventories had not been available to [ ████████ ], that would not necessarily mean that [ ████████ ] would have bought domestic products instead. In the case of [ ████████████████████ ]. Only two percent or less of U.S. producers' shipments are amber or darker. Due to some purchasers' continued preference for honey from Vietnam, importers including [ ██████ ] continued to import and sell honey from Vietnam even with interim deposit requirements in place and at higher prices than domestically produced honey.

Commissioner Johanson Dissent, CR No. 814, at 4 (May 31, 2022).

In short, the record demonstrates that [ ██ ] percent of the Vietnamese raw honey is the dark amber that most bakers rely upon, while a trivial [ ██ ] percent of U.S. production is of the same product. For this reason, as well, whatever small remaining inventories of critical circumstances raw honey existed at the time of the order were not in a position to displace sales of U.S.-produced raw honey or to push down prices for U.S.-produced raw honey, which is not even suitable for use in the baking sector that relies on Vietnamese raw honey.

At this point, it has become tedious to point out that the Commission has an obligation to respond to "significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx. Inc.*, 25 CIT at 1117-18. Yet at every turn, the Majority ignores plainly relevant

record information. The failure of the Majority to take into account this highly material information on the record, once again, provides further proof that the Majority's determination is unsupported by substantial evidence.

**VIII.    CONCLUSION**

Putting all of the foregoing together, the Majority began its determination by ignoring the statutory requirements that it base its determination contemporaneous and meaningful importer and end-user inventory data. It then compounded its error by ignoring inventory-related data placed on the record by importers and packers that contradicted its conclusion. And it then concluded by ignoring key evidence of U.S. industry shortages and product differences, all in violation of its responsibilities to address key arguments and material evidence that contradicts its conclusion.

As noted at the outset of this Memorandum of Law, Plaintiffs are well aware that this Court is not supposed to reweigh the evidence, which is why at no point in the foregoing do Plaintiffs request that the Court do so. In each and every instance noted above, Plaintiffs do not take dispute with the manner in which the Majority analyzed the record; rather, Plaintiffs point out that the Majority provided no analysis *at all*. It is impossible to claim that a determination rests on a stable substantial evidence foundation when the determination at issue repeatedly does not even mention material, contradictory evidence, let alone take it into account.

4864-5736-6853.2

If the Majority had actually examined the evidence, as the Dissent did, then it would have reached the only determination supported by the evidence, which is that "the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition was largely if not entirely eliminated in the next six months before the order," Commissioner Johanson Dissent, CR No. 814, at 9 (May 31, 2022), thus mandating a negative critical circumstances determination. The Majority's failure to do so thus led it not only to fail to support its determination with substantial evidence, but also caused it to issue a determination that was contrary to law. In these circumstances, there is no basis to affirm the Majority's determination.

December 19, 2022

/s/ Gregory Husisian
Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300

Counsel for Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc.

36

**Certification of Compliance With Chambers Procedure 2(B)(2)**

The undersigned hereby certifies that the foregoing brief contains 12,075 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitations of 14,000 words for primary briefs set forth in the Chamber Procedures of the U.S. Court of International Trade.

Respectfully submitted,

December 19, 2022

*/s/ Gregory Husisian*
Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300

Counsel for Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc.

4864-5736-6853.2