*PUBLIC VERSION*

---

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE LEO M. GORDON**

---

Court No. 22-00188

**SWEET HARVEST FOODS,**

*Plaintiff,*

and

**EXPORT PACKERS COMPANY LIMITED, HONEY HOLDING I, LLP
DBA HONEY SOLUTIONS, SUNLAND TRADING, INC., NATIONAL
HONEY PACKERS & DEALERS ASSOCIATION (NHPDA),**

*Consolidated Plaintiffs,*

**v.**

**UNITED STATES,**

*Defendant,*

and

**AMERICAN HONEY PRODUCERS ASSOCIATION, and SIOUX HONEY
ASSOCIATION,**

*Defendant-Intervenors.*

---

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S
PUBLIC MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

---

MICHAEL K. HALDENSTEIN
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3041
Fax: (202) 205-3111
Michael.Haldenstein@usitc.gov

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

**DATED:  MARCH 10, 2023**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... v

I.  INTRODUCTION ..................................................................................... 1

II.  STATEMENT PURSUANT TO RULE 56.2 ........................................... 1

    A.  Administrative Determination Under Review ........................... 1

    B.  Issues Presented ........................................................................... 2

        1.  Were the Commission's findings concerning the timing and volume of subject imports from Vietnam subject to Commerce's finding of critical circumstances supported by substantial evidence and in accordance with law? ............................................ 2

        2.  Were the Commission's findings concerning the rapid increase in inventories of subject imports from Vietnam subject to Commerce's finding of critical circumstances supported by substantial evidence and in accordance with law? ............................................ 3

        3.  Were the Commission's findings concerning other factors and conditions of competition supported by substantial evidence and in accordance with law? ................................. 4

III.  STANDARD OF REVIEW ...................................................................... 5

IV.  ARGUMENT ............................................................................................ 8

    A.  Introduction .................................................................................. 8

    B.  The Commission Properly Considered Critical Circumstances Following Commerce's Affirmative Determination of Critical Circumstances ......................................... 9

    C.  The Commission's Unchallenged Findings Concerning the Timing and Volume of Imports Are Supported by Substantial Evidence and in Accordance with Law ............................... 12

        1.  The Commission Considered the Volume of Imports from Vietnam During an Appropriate Post-Petition Period Prior to Suspension of Liquidation ................................. 14

        2.  Plaintiffs Incorrectly Argue the Commission Should Have Only Considered Imports During a 90-Day Period for Critical Circumstances .......................................... 14

## TABLE OF CONTENTS (cont'd)

D.   **The Commission's Unchallenged Findings Concerning the Rapid Increase in Inventories Are Supported by Substantial Evidence and in Accordance with Law** ................................................................**16**

    1.   The Commission Found the Inventories of Raw Honey Were Not for Immediate Consumption and Likely Still in the Supply Chain .....................................................................17

    2.   Plaintiffs Failed to Exhaust Their Administrative Remedies ...................19

        a.   Plaintiffs Did Not Request Collection of 2022 Inventory Data or Inventory Data from End Users as Required by Commission Rules .................................................19

        b.   Plaintiffs Argue That the Commission Should Have Collected 2022 Inventory Data That Was Already in the Record ...................................................................22

        c.   Plaintiffs Misstate the Record Concerning End User Inventories ......................................................................23

E.   **The Commission Did Not Need 2022 Inventory Information to Assess Inventories Under the Critical Circumstances Provision** ....................**24**

    1.   The Commission Reasonably Relied on Inventory Information Covering Imports Prior to Imposition of Provisional Duties ......................................................................24

    2.   The Statute and Legislative History Support the Commission's Collection of Inventory Information from the Period Before the Effective Date of the Order ....................................27

    3.   Declines in Inventories After Suspension of Liquidation Do Not Show the Order's Remedial Effect Was Not Likely to be Undermined .......................................................................30

    4.   The Commission Reasonably Did Not Collect Post-POI Inventory Data ..........................................................................32

    5.   The Commission Reasonably Did Not Collect Data From End Users ........................................................................34

## TABLE OF CONTENTS (cont'd)

F.   Other Information in the Record Supports the Commission's
     Affirmative Critical Circumstances Determination ........................................35

     1.   The Commission's Additional Unchallenged Findings
          Support Its Affirmative Critical Circumstances
          Determination ........................................................................35

     2.   The Record Belies Plaintiffs' Claim of Domestic Industry Shortages ......36

     3.   The Commission Addressed Other Evidence Plaintiffs Claim
          Was Ignored ........................................................................40

     4.   The Commission Found Raw Honey from Vietnam and
          Domestically Produced Raw Honey Compete for Sales
          in the U.S. Market ................................................................41

G.   The Findings of a Dissenting Commissioner Have No Bearing
     on the Court's Review of the Commission's Findings ....................................44

H.   The Commission Exhaustively Collected Data Necessary for
     Its Critical Circumstances Determinations ............................................45

V.   CONCLUSION ................................................................................47

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*Acciai Speciali Terni, S.p.A. v. United States,*
    19 CIT 1051 (1995) ...................................................................................37

*Altx Inc. v. United States,*
    25 CIT 1100, 167 F. Supp. 2d 1353 (2001) .................................................37

*Am. Spring Wire Corp. v. United States,*
    8 CIT 20, 590 F. Supp. 1273 (1984) ...........................................................33

*Armstrong Bros. Tool Co. v. United States,*
    626 F.2d 168 (C.C.P.A. 1980) .......................................................................7

*Chemours Co. FC, LLC v. United States,*
    492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ...............................................5

*Coal. of Gulf Shrimp Indus. v. United States,*
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) .............................................6, 7

*Consol. Fibers, Inc. v. United States,*
    32 CIT 855, 574 F. Supp. 2d 1371 (2008) ..................................................22

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ............................................................................5, 7, 44

*Goss Graphics Sys., Inc. v. United States,*
    22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir.
    2000) ..............................................................................................................6

*Grupo Industrial Camesa v. United States,*
    85 F.3d 1577 (Fed. Cir. 1996) .....................................................................44

*Hynix Semiconductor, Inc. v. United States,*
    30 CIT 1208, 431 F. Supp. 2d 1302 (2006) ..................................................7

*ICC Indus., Inc. v. United States,*
    10 CIT 181, 632 F. Supp. 36 (1986) ............................................................11

*ICC Indus., Inc. v. United States,*
    812 F.2d 694 (Fed. Cir. 1987) .....................................................................11

*Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n,*
    30 CIT 1181 (2006) .......................................................................................7

*Int'l Indus., Ltd. v. United States,*
    311 F. Supp. 3d 1325 (Ct. Int'l Trade 2018) ...............................................6

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                **Page(s)**

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n,*
253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019) ................................................................................................................5

*Jeld-Wen, Inc. v. United States,*
567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ...........................................................24

*JMC Steel Grp. v. United States,*
70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ....................................................6, 7, 26

*Matsushita Elec. Indus. Co. v. United States,*
750 F.2d 927 (Fed. Cir. 1984)...................................................................................7

*Maverick Tube Corp. v. United States,*
37 ITRD 2829, 2016 WL 703575 (Ct. Int'l Trade Feb. 22, 2016), *aff'd*, 857 F.3d 1353 (Fed. Cir. 2017) .......................................................................................45

*Metallverken Nederland B.V. v. U.S.,*
728 F. Supp. 730 (Ct Int'l Trade 1989) .............................................................44, 45

*Nevinnomysskiy Azot v. United States,*
32 CIT 642, 565 F. Supp. 2d 1357 (2008) ................................................................6

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006).............................................................................6, 7

*Rhone Poulenc, Inc. v United States,*
899 F.2d 1185 (Fed. Cir. 1990)..............................................................................23

*Sandvik Steel Co. v. United States,*
164 F.3d 596 (Fed. Cir. 1998).........................................................................20, 24

*Shandong TTCA Biochem. v. United States,*
35 CIT 545, 774 F. Supp. 2d 1317 (2011) ................................................................7

*Siemens Energy, Inc. v. United States,*
806 F.3d 1367 (Fed. Cir. 2015)..............................................................................44

*U.S. Steel Grp. v. United States,*
96 F.3d 1352 (Fed. Cir. 1996).............................................................................6, 7

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                             **Page(s)**

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)............................................................................................5

*Usinor, et al. v. United States*,
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004)...................................................6

*Valeo N. Am., Inc. v. United States*,
    404 F. Supp. 3d 1303 (Ct. Int'l Trade 2019)...........................................22, 40

*Whirlpool Corp. v. United States*,
    37 CIT 1775 (2013) ..........................................................................................7

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................................5

19 U.S.C. § 1673b(e)(2)(A) .....................................................................................8

19 U.S.C. § 1673d(a)(3)..................................................................................2, 8, 15, 27

19 U.S.C. § 1673d(b)(4) ...........................................................................................8

19 U.S.C. § 1673d(b)(4)(A) .....................................................................................1

19 U.S.C. § 1673d(b)(4)(A)(i) ...................................................................2, 8, 10, 15, 27

19 U.S.C. § 1673d(b)(4)(A)(ii).........................................................................10, 35

19 U.S.C. § 1673d(b)(4)(A)(ii)(II)...................................................................17, 28

19 U.S.C. § 1673e.............................................................................................15, 27

19 U.S.C. § 1677c ..................................................................................................33

19 U.S.C. § 1677m(g)............................................................................................32

28 U.S.C. § 2637(d) ...............................................................................................20

28 U.S.C. § 2639(a)(1)..............................................................................................5

**Regulations**

19 C.F.R. § 207.20(b) .............................................................................................20

19 C.F.R. § 207.30.............................................................................................32, 33

## TABLE OF AUTHORITIES (cont'd)

**Federal Register Notices**                                                          **Page(s)**

86 Fed. Reg. 66,526 (Dep't of Comm.) (Nov. 23, 2021)........................................................14, 25

86 Fed. Reg. 66,531 (Dep't of Comm.) (Nov. 23, 2021)........................................................21, 46

87 Fed. Reg. 2,127 (Dep't of Comm.) (Jan. 13, 2022) .........................................15, 21, 28, 46, 47

87 Fed. Reg. 22,184 (Dep't of Comm.) (Apr. 14, 2022) ..................................................15, 28, 32

87 Fed. Reg. 35,501 (Dep't of Comm.) (June 10, 2022) ........................................................10, 25

**Legislative Materials**

H.R. Rep. No. 317, 96th Cong., 1st Sess. 63 (1979) ...................................................................11

Statement of Administrative Action to the Uruguay Round Agreement Act,
   H.R. Rep. 103-316, vol. I (1994) ..........................................................................11, 15, 28, 29

## I.     INTRODUCTION

Defendant United States International Trade Commission hereby responds to the brief ("PBR") filed by Plaintiffs Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, Sunland Trading, Inc., and the National Honey Packers & Dealers Association ("NHPDA") (collectively, "Plaintiffs") (ECF27).  Plaintiffs challenge the Commission's affirmative finding of critical circumstances in its antidumping investigation of raw honey from Vietnam.  *Raw Honey from Argentina, Brazil, India, and Vietnam,* Inv. Nos. 731-TA-1560-1562 and 731-TA-1564 (Final), USITC Pub. 5327 (May 2022) (PR193).[1]

## II.     STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determination under Review

Plaintiffs seek review of the Commission's affirmative determination of critical circumstances pursuant to 19 U.S.C. § 1673d(b)(4)(A) in the Commission's investigation of raw honey from Vietnam.  The Commission's determination was made in *Raw Honey from Argentina, Brazil, India, and Vietnam,* Inv. Nos. 731-TA-1560-1562 and 731-TA-1564 (Final), USITC Pub. 5327 (May 2022) (PR193).  The Commission's determinations were published at 87 Fed. Reg. 33,831 (June 3, 2022) (PR194).

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's public views and publication are to record document PR193, and citations to the confidential Commission Views (hereinafter, "Views") are to record document CR813.

### B.  Issues Presented

### 1.  Were the Commission's findings concerning the timing and volume of subject imports from Vietnam subject to Commerce's finding of critical circumstances supported by substantial evidence and in accordance with law?

Yes.  The Commission followed the specific requirements of the statute and considered the "timing and volume" of imports of raw honey from Vietnam subject to Commerce's critical circumstances finding.  The Commission found that the volume of subject imports from Vietnam in the post-petition period increased rapidly and was substantial relative to apparent U.S. consumption.  The Commission also found that the timing and volume of the imports showed an intent both to evade the relief provided by the November provisional antidumping measures, as well as to assure entry of the imports prior to the August date on which potential retroactive measures would be applied in the event of an affirmative critical circumstances determination that would make duties apply to entries on or after August 25, 2021.

The Commission also chose the appropriate six-month comparison period when analyzing the post-petition volume of imports subject to Commerce's critical circumstances finding.  The statute and legislative history call for the Commission to consider entries subject to Commerce's finding of critical circumstances.  *See* 19 U.S.C. § 1673d(b)(4)(A)(i) ("{T}he final determination of the Commission shall include a finding as to whether the imports subject to {Commerce's} affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order. . . .").  Plaintiffs incorrectly maintain that instead the Commission should only have considered imports during the 90-day critical circumstances period.  They have, however, confused the 90-day retroactive application of duties with the entries subject to Commerce's finding of critical circumstances.

       **2.   Were the Commission's findings concerning the rapid increase in inventories of subject imports from Vietnam subject to Commerce's finding of critical circumstances supported by substantial evidence and in accordance with law?**

Yes.  As detailed in the Commission's Views, the Commission found that inventories of subject imports from Vietnam almost tripled in the post-petition period and were not explained by consumption patterns.  The uncontested record evidence showing a rapid increase in inventories stockpiled before provisional duties applied to subject imports from Vietnam constitute substantial evidence supporting the Commission's finding concerning a statutory factor, the "rapid increase in inventories of the imports" subject to Commerce's affirmative critical circumstances determination during the post-petition period.  Plaintiffs now belatedly argue that the Commission should have collected additional data and tracked the inventories long after the period of investigation ("POI") ended in September 2021.  This argument should be rejected in the first instance because Plaintiffs failed to avail themselves of the opportunity to request collection of these data when they commented on the Commission's questionnaires, or at any other time during the Commission's investigations.

Moreover, Plaintiffs' claims do not bear upon the Commission's findings concerning the rapid increase in inventories before suspension of liquidation and provisional duties began to be collected in November 2021.  The Commission collected and relied on inventory data from October 2021, immediately before suspension of liquidation when provisional duties began to be collected.  Consistent with the statute, these were the most relevant inventory data bearing upon whether the remedial effect of the order, which began upon collection of duties in November 2021, would be seriously undermined.

**3.  Were the Commission's findings concerning other factors and conditions of competition supported by substantial evidence and in accordance with law?**

Yes. The Commission considered several additional factors it considered relevant, none of which is challenged by Plaintiffs.  The Commission found that the industry condition remained weak in 2021. The industry continued to report losses even with higher prices.  Its operating expenses-to-net sales ratio remained very high.  The domestic industry's shipments declined, and it continued to lose market share.  The Commission also found that, unlike subject imports from Argentina, subject imports from Vietnam continued to undersell the domestic like product by wide margins during 2021.  The poor condition of the industry and the continued underselling by subject imports from Vietnam further indicated that the relief provided by the antidumping duty order was likely to be undermined by the large volumes of subject imports from Vietnam that were in inventories and underselling the domestic product despite the pendency of the investigations.  These additional unchallenged considerations provide further support for the Commission's affirmative critical circumstances finding.

The Commission also thoroughly analyzed the degree of competition between domestically produced raw honey and raw honey from Vietnam.  It addressed the issue in its discussion of a reasonable overlap of competition for cumulation, conditions of competition, and the impact of subject imports on the domestic industry.  Further, in its discussion of the impact of the subject imports, the Commission specifically rejected Plaintiffs' current arguments that subject imports from Vietnam had special uses and did not compete with domestically produced raw honey.  Plaintiffs insist the evidence was uncontradicted that there was no competition, yet Plaintiffs did not appeal the Commission's finding of injury by reason of subject imports from Vietnam.  Nor did Plaintiffs argue to the Commission that there was no reasonable overlap of competition between subject imports from Vietnam and domestically produced raw honey.

The record also did not show severe shortages of domestically produced honey as Plaintiffs maintain.  The evidence Plaintiffs rely upon mostly concerns imported raw honey.  Plaintiffs also cite the domestic industry's lower inventories late in the period, but the record showed the domestic industry was forced to inventory its raw honey earlier in the period because raw honey prices were so low.  The record showed the industry had unusually high inventories, but these inventories declined later in the period after the petitions were filed, which led to higher prices.

## III.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotations omitted).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1347 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913-14 (Fed. Cir. 2019).

Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006); *Int'l Indus., Ltd. v. United States*, 311 F. Supp. 3d 1325, 1333 (Ct. Int'l Trade 2018).  In its role as trier of fact in injury investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'"  *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 653, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd,* 216 F.3d 1357 (Fed. Cir. 2000)).  As the fact finder, the "ITC is afforded considerable discretion in evaluating information obtained from questionnaires." *Int'l Indus.*, 311 F. Supp. 3d at 1333 (quotations omitted).  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder — here . . . the Presidentially-appointed, Senate-approved Commissioners — to decide which side's evidence to believe."  *Nippon Steel*, 458 F.3d at 1359.  "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96 F.3d at 1357.  In other words, "the Court may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor, et al. v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015); *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4 (citing *Shandong TTCA Biochem. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)); *accord Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 1215, 431 F. Supp. 2d 1302, 1306, 1310–11 (2006); *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1365 (citing *U.S. Steel Grp.,* 96 F.3d at 1361-62); *see also Whirlpool Corp. v. United States,* 37 CIT 1775, 1786 (2013) ("As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not . . . question the agency's methodology.") (quoting *Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Comm'n*, 30 CIT 1181, 1189 (2006)).

That a Plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo,* 383 U.S. at 619-20; *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.4 (C.C.P.A. 1980)). Moreover, "when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of the Commission." *Nippon*, 458 F.3d at 1358.

With respect to critical circumstances, Plaintiffs provide an incorrect statement of the law in the standard of review section of their brief (and elsewhere). They wrongly state that only the "specific entries that occurred during the *ninety-day* period" matter and that "the issue before the Commission is to consider whether the exact entries of raw honey from Vietnam that entered during the *ninety-day* critical circumstances period are in a position to 'undermine seriously' the remedial effect of the order." PBRat8-9,11 (emphasis added).

Plaintiffs appear to be confusing the post-petition period with the 90-day retroactive application of duties that occurs when Commerce and the Commission both make affirmative critical circumstances determinations.  As noted, the antidumping duty statute calls for the retroactive imposition of duties 90 days prior to the date that liquidation of entries is suspended, and provisional duties are first imposed if Commerce and the Commission make affirmative findings of critical circumstance.  *See* 19 U.S.C. § 1673b(e)(2)(A).  However, as explained *infra* in Section IV.C.2, rather than considering only 90 days of entries for its determination, the Commission is statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination . . . are likely to undermine seriously the remedial effect of the {antidumping duty} order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(i). These imports are those entering during a longer period, the period between the filing of petitions and suspension of liquidation.

## IV.   ARGUMENT

### A.  Introduction

When the Commission finds that the domestic industry is materially injured and the Department of Commerce makes an affirmative determination of critical circumstances in its parallel antidumping investigation, the Commission must make a finding concerning critical circumstances.  *See* 19 U.S.C. §§ 1673d(b)(4), 1673d(a)(3).  The critical circumstances provision requires the Commission to find whether imports subject to Commerce's affirmative determination are likely to undermine seriously the remedial effect of the antidumping order. The Commission, like Commerce, examines the imports in the period after the petitions were filed (April 21, 2021) and before suspension of liquidation when provisional antidumping duties begin to be collected (November 23, 2021).

The effect of affirmative critical circumstances determinations by Commerce and the Commission is that antidumping duties are made retroactive by 90 days from suspension of liquidation.  In this investigation, that meant that the antidumping duty order covering raw honey from Vietnam became effective August 25, 2021, instead of November 23, 2021, when duties were first collected.

Plaintiffs do not challenge the Commission's findings with respect to the timing and volume of imports, and they do not deny that inventories of subject imports from Vietnam increased rapidly prior to suspension of liquidation.  They also do not dispute the Commission's additional findings supporting its affirmative finding of critical circumstances.  Their challenge amounts to a claim the Commission should have collected alternative data that could show that the rapid increase in inventories was followed by a decline after provisional duties were in place. Plaintiffs, however, never asked for the inventory data to be collected, and in any event, the data were for a period that was long after the Commission's POI ended.  Indeed, the information would have been of limited relevance to the Commission's critical circumstances determination —which looks at data immediately following the filing of the petition but preceding the suspension of liquidation — because Plaintiffs' requested data instead covered a period after the imposition of provisional duties.

### B.  The Commission Properly Considered Critical Circumstances Following Commerce's Affirmative Determination of Critical Circumstances

Because the Department of Commerce made a final affirmative critical circumstances determination with respect to Vietnamese producers/exporters of raw honey and the Commission made an affirmative material injury determination with respect to subject imports from Vietnam the Commission was required to make a critical circumstances determination.  The affirmative findings of critical circumstances by Commerce and the Commission meant that duties on raw

honey from Vietnam would be made retroactive by 90 days.  Rather than applying to entries of raw honey from Vietnam after November 23, 2021, duties were retroactive, payable on entries after August 25, 2021.  *See* 87 Fed. Reg. 35,501, 35,502 (June 10, 2022).

The Commission also conducted a critical circumstances examination for imports from Argentina, using data from the same period that it used for the evaluation of subject imports from Vietnam.  Based on the data concerning those imports, the Commission found that the imports from Argentina subject to Commerce's affirmative critical circumstances determination would not seriously undermine the remedial effect of the antidumping duty order with respect to raw honey from that country.  Views, CR813, at 67-69.

In both investigations, the Commission was statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination . . . are likely to undermine seriously the remedial effect of the {antidumping duty} order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(i).  In evaluating this issue, as required by statute, the Commission considered the "timing and the volume of the imports"[2] subject to Commerce's affirmative critical circumstances determinations, "the rapid increase in inventories of the imports," as well as "any other circumstances indicating that the remedial effect of the antidumping duty order will be seriously undermined."  *See* 19 U.S.C. § 1673d(b)(4)(A)(ii).

---

[2] Plaintiffs repeatedly misquote this portion of the statue as requiring an analysis of "the timing and *value* of the imports."  *See* PBRat11,13.  As noted, the statute indicates that the Commission should consider the "timing and *volume* of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii) (emphasis added).  In every aspect of these investigations, the Commission primarily examined the "volume" of raw honey in terms of quantity.  *See, e.g.*, Views, CR813, at 40-41.

The legislative history explains that the critical circumstances provision was designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}." *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed. Cir. 1987) (quoting H.R. Rep. No. 317, 96th Cong., 1st Sess. 63 (1979)), *aff'g*, 10 CIT 181, 632 F. Supp. 36 (1986).

Further, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act indicates that the Commission should analyze the period prior to the effective date of the order as the Commission's critical circumstances determination is focused "on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order." H.R. Rep. 103-316, vol. I at 877 (1994) (hereinafter, "SAA"). The SAA additionally explains that the Commission should determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." *Id.*

Thus, the Commission analyzes the likely effects of the surge in imports entering *prior* to suspension of liquidation that are normally not subject to antidumping duties. Specifically, consistent with the Congressional mandate to analyze whether the imports are likely to seriously undermine the remedial effect of the order, the Commission focuses on the imports that entered after the filing of the petition and prior to suspension of liquidation at which time relief becomes effective. Indeed, this is the same body of imports that Commerce evaluates. *See* SAA at 876 (Commerce determines whether "there have been massive imports of the subject merchandise

over a relatively short period of time (*i.e.,* a surge of imports) prior to the suspension of liquidation . . . .").

In assessing the "timing and volume" of imports subject to Commerce's affirmative critical circumstances determination, the Commission typically compares the volume of imports over the six months prior to the filing of the petition with the volume of imports over the six months after the filing of the petition.  *See* Views, CR813, at 66 (discussing Commission's choice of periods).[3]

### C.  The Commission's Unchallenged Findings Concerning the Timing and Volume of Imports Are Supported by Substantial Evidence and in Accordance with Law

In assessing the first factor specified in the statue, "the timing and volume of imports" the Commission compared the volume and timing of imports in the post-petition period before Commerce's imposition of provisional duties with the imports during the period prior to the filing of the petitions.  The Commission found that both the timing and volume of the subject imports from Vietnam supported a finding that the remedial effect of the antidumping duty order would be seriously undermined.

First, there was a rapid increase in subject imports from Vietnam in unprecedented monthly volumes that were large relative to apparent U.S. consumption.  Subject imports from Vietnam increased by 83.2 percent in the pre-petition period to 87.9 million pounds in the post-petition period— equivalent to 19.1 percent of apparent U.S. consumption in interim 2021

---

[3] In rare instances, not applicable in the current investigations, the Commission may alter the comparison periods if Commerce makes its preliminary determination during the six-month period after the filing of the petition.

(January 2021 - September 2021).  Subject imports from Vietnam increased rapidly in each of the first four months of the post-petition period, reversing a downward trend from December 2020 to April 2021.  Views, CR813, at 69-70.

The increase in subject imports also could not be explained by consumption patterns during the period.  Apparent U.S. consumption was higher in interim 2021 than interim 2020 (January 2020 - September 2020) by 15.2 percent, yet importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that did not explain why importers would sharply increase their imports of raw honey from Vietnam during the post-petition period, an increase that resulted in inventories almost tripling.  Views, CR813, at 72.

The timing of the subject imports from Vietnam in the post-petition period was also important as it showed importers were likely attempting to avoid provisional duties.  The rapid increase in subject imports from Vietnam occurred during the first four months of the post-petition period, which preceded the retroactive liability period under the critical circumstances provision (*i.e.,* 90 days prior to the date of publication of Commerce's preliminary antidumping determination on November 23, 2021, which is August 25, 2021).  After August 2021, when retroactive duties could apply, subject imports from Vietnam stopped increasing.  *See* Final Staff Report, CR805, at Table IV-8 & Fig. IV-3.  The Commission found a "deliberate effort to enter product into the U.S. market in substantial and increasing volumes while evading potential exposure to the retroactive application of antidumping duties."  Views, CR813, at 72.

Thus, several findings concerning the timing and volume of subject imports from Vietnam supported the Commission's affirmative critical circumstances determination.  These findings, together with other unchallenged findings, provide the foundation for the Commission's affirmative critical circumstances determination.  Notwithstanding Plaintiffs'

claim that the Commission's critical circumstances determination is unsupported by substantial evidence, they do not dispute any of these findings or conclusions concerning the timing and volume of imports of raw honey from Vietnam.  PBRat12.

### 1. The Commission Considered the Volume of Imports from Vietnam During an Appropriate Post-Petition Period Prior to Suspension of Liquidation

The petitions concerning raw honey from Vietnam were filed on April 21, 2021.  86 Fed. Reg. 22,265 (April 27, 2021) (PR17).  Commerce made its preliminary determination for Vietnam on November 17, 2021.  86 Fed. Reg. 66,526 (Nov. 23, 2021).  Based on the timing of filing of the petitions and Commerce's preliminary determination, the Commission compared the volume of subject imports from Vietnam in the six months prior to the filing of the petitions (November 2020 – April 2021) with the volume in the six months after the filing of the petitions (May 2021 – October 2021), a period before the provisional measures ordered by Commerce in its preliminary determination in November 2021.  Views, CR813, at 67; Final Staff Report, CR805, at Table IV-8.  Petitioners and respondents participating in the Commission's investigations (including Plaintiffs) agreed with the Commission's choice of these comparison periods.  Views, CR813, at 67 n.280.  Plaintiffs also state in their brief that they do not challenge the Commission's choice of periods or methodology in assessing the increase in subject imports from Vietnam.  PBRat13.

### 2. Plaintiffs Incorrectly Argue the Commission Should Have Only Considered Imports During a 90-Day Period for Critical Circumstances

As already touched upon, Plaintiffs incorrectly argue in their standard of review and elsewhere that only 90 days of imports should be considered by the Commission in its analysis of critical circumstances.  PBRat8-9,11-13.  The critical circumstances provision, however, instructs the Commission to consider the timing and volume of imports and the rapid increase in

inventories of the imports that are subject to Commerce's critical circumstances finding. "{T}he final determination of the Commission shall include a finding as to whether *the imports subject to the affirmative determination under subsection (a)(3)* are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title." 19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added). Subsection (a)(3) sets forth Commerce's critical circumstances determination. *See* 19 U.S.C. § 1673d(a)(3). Commerce makes its finding of critical circumstances concerning imports in the post-petition period prior to suspension of liquidation. *See* 87 Fed. Reg. 2,127, 2,129-30 (Jan. 13, 2022) (preliminary determination of critical circumstances for Vietnam); 87 Fed. Reg. 22,184, 2,2185 (Apr. 14, 2022) (final determination of critical circumstances). This post-petition period started in April 2021 with the filing of the petitions and ran until suspension of liquidation in November 2021.

The SAA also indicates that the Commission considers subject imports in the post-petition period prior to suspension of liquidation. It states that the "Commission is to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877. Thus, the issue for the Commission was not, as Plaintiffs also incorrectly state, whether the remedial effect of the order would be seriously undermined without the retroactive application of duties for 90 days. PBRat8-9,11. Instead, the issue for the Commission was, as it properly analyzed, whether the subject imports entering during the period after the filing of the petition and prior to suspension of liquidation were likely to seriously undermine the remedial effect of the antidumping duty order.

15

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### D. The Commission's Unchallenged Findings Concerning the Rapid Increase in Inventories Are Supported by Substantial Evidence and in Accordance with Law

As required under the statute, the Commission considered whether there had been a rapid increase in inventories prior to suspension of liquidation.  The Commission relied on inventory data provided by U.S. importers in their questionnaire responses and supplemental questionnaire responses in the final phase of the investigations.[4]  Views at 71 n.299, CR813, (citing supplemental questionnaires).

The Commission found that importers' inventories of subject imports from Vietnam subject to Commerce's affirmative determination increased from [███] million pounds on April 30, 2021 (the last month of the pre-petition period) to [███] million pounds on October 31, 2021 (the last month of the post-petition period), almost a threefold increase over their April 2021 level.  Views, CR813, at 70-71.

The Commission also found that several importers ([██████████████]) had increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021.  Specifically, the Commission observed, and the record shows that:

- [██████████████████████████████████████ ███████████████] pounds;

- [██████████████████████████████████████ ███] pounds; [██████████████████████████████████ ███████] pounds;

- [██████████████████████████████████████ ] pounds;

---

[4] As explained *infra* in Section IV.H, Plaintiffs' claims that the Commission did not collect data for its examination of critical circumstance in the final phase of its investigations is wholly without merit.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*



- [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛] pounds;

- [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛] pounds;

- the [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛] pounds; and

- [⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛]
pounds.

Views, CR813, at 71 n.299 (citing Supplemental Importer Questionnaires).  The

Commission further observed that the level of inventories as of September 30, 2021, was

equivalent to [⬛] percent of apparent U.S. consumption during the interim 2021 period.  Views,

CR813, at 71.

Thus, the record showed that, as a result of the large increase in subject imports from

Vietnam that were not in response to a corresponding increase in consumption, inventories of

subject imports from Vietnam subject to Commerce's finding rose rapidly before provisional

duties were imposed.  Although, as discussed *infra* at Section D.2, Plaintiffs now impermissibly

argue for the collection of inventory data from after the POI and suspension of liquidation, the

above findings by the Commission concerning the rapid increase in inventories before

provisional duties are not disputed by Plaintiffs.  They constitute substantial evidence supporting

the Commission's finding of a "rapid increase in inventories of the imports" subject to

Commerce's affirmative critical circumstances determination during the post-petition period and

prior to the effective date of relief.  *See* 19 U.S.C. § 1673d(b)(4)(A)(ii)(II).

### 1. The Commission Found the Inventories of Raw Honey Were Not for Immediate Consumption and Likely Still in the Supply Chain

The Commission explained that it was unlikely that the surge in subject imports from

Vietnam and the nearly tripling of inventories of raw honey from Vietnam prior to import relief

were needed to serve demand.  Although apparent consumption was 15.2 percent higher in

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

interim 2021, importers' shipments of subject imports from Vietnam were only 2.8 percent

higher.  These data indicated the subject imports from Vietnam increased so they could evade

antidumping duties and be stockpiled for later use rather than serve current demand.  Views,

CR813, at 72.  Plaintiffs ignore the increase in imports and inventories of raw honey from

Vietnam before suspension of liquidation.

　　　　Further, responding to arguments concerning sold-off inventories in 2022, the

Commission stated "{r}espondents argue that importers have now sold off much of their

inventory, but regardless of where the imported honey is in the supply chain, the volume

associated with these inventories is large and increased substantially in the post-petition period

and is likely to place downward pressure on prices until it is consumed by end users, particularly

given the continued underselling by subject imports from Vietnam at wide margins."  Views,

CR813, at 73.  The Commission also noted that demand for honey for use in food products is

relatively inelastic, making it even more unlikely the increased imports and inventories of honey

would be immediately consumed no matter how low the raw honey was priced.  Rather, it was

likely that the honey would remain in the supply chain because the record showed it was likely

not for immediate consumption.  Views, CR813, at 72-73, 73 n.305.  The supply chain could

include importers, packers, or end users.  Contrary to Plaintiffs' claims, the Commission never

made a finding about the level of end users' inventories because there were no end user

inventory data.  Instead, it found that it did not matter where the raw honey was in the supply

chain if it had not yet been consumed.

　　　　Furthermore, although Plaintiffs devote several pages to a claim by petitioners that

[　　　　　] purchased [　　　　　　　　　　　　　　　　　　　　],

the Commission explained that it did not accept petitioners' claim.  *See* PBRat22-28 ([　　])

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

█████ ] pounds from [██████████ ]).  The Commission noted petitioners' argument and also observed that [██████████ ] and the other large industrial users that filed briefs with the Commission could have provided information concerning their holdings of raw honey from Vietnam in 2022 to help resolve the issue.  *See* Views, CR813, at 74 n.306.  Rather than relying on the level of end user inventories as Plaintiffs contend, the Commission specifically indicated that the record did not show the level of end users' inventories.  *Id.*

Thus, contrary to Plaintiffs' description of the Commission's explanation, the Commission never found that end users were hoarding raw honey.  *See* PBRat22,24.  Nor did the Commission rely on petitioner's claim that [██████████████████ ] pounds of raw honey from Vietnam as support for its finding of downward pressure on prices by subject imports from Vietnam.  *See* PBRat26.  To the contrary, the Commission relied upon the size and increase in importers' inventories of subject imports from Vietnam, as well as "the continued underselling by subject imports from Vietnam at wide margins."  *See* Views, CR813, at 73.

The Commission further indicated that it did not matter who was holding the raw honey because it was "likely to place downward pressure on prices until it is consumed by end users," regardless of where it was in the supply chain.  Views, CR813, at 73.  Plaintiffs themselves actually make the Commission's point.  That is, they state that to have an effect, "logically, the critical circumstances entries must be in the inventory of the importers, the packers, or the end-users."  PBRat14.

### 2.  Plaintiffs Failed to Exhaust Their Administrative Remedies

#### a.  Plaintiffs Did Not Request Collection of 2022 Inventory Data or Inventory Data from End Users as Required by Commission Rules

Plaintiffs' primary argument is that the Commission should have gathered 2022 inventory information from U.S. importers and end users concerning their holdings of raw honey from

Vietnam.  Plaintiffs, however, did not ask the Commission to collect this information for 2022. They instead argued in their posthearing brief that probative importer and packer inventory data from 2022 were in the record for the Commission's consideration.  *See* NHPDA's Posthearing Brief, CR788, at 14 & Exhibit 3.

It is well settled that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted, … since it is a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (internal quotation omitted).  The Court of International Trade requires exhaustion of administrative remedies in challenges to Commission determinations.  *See* 28 U.S.C. § 2637(d) (providing that the court shall, where appropriate, require the exhaustion of administrative remedies).

The Commission's rules specifically indicate that parties must request collection of new information in their comments on draft questionnaires.  19 C.F.R. § 207.20(b).  Commission Rule 207.20(b) also provides that the "Commission will disregard subsequent requests for collection of new information absent a showing that there is a compelling need for the information and that the information could not have been requested in the comments on the draft questionnaires."  *Id.*  The Commission's letter to parties accompanying the draft questionnaires asked that parties "identify any issues that would affect the due date and the data collection period in the questionnaires."  Draft Questionnaire Transmittal Letter, PR93 (June 30, 2021). Plaintiff NHPDA commented on the draft questionnaires, but it did not ask for any information to be collected from end users or after September 2021.  *See* NHPDA's Comments on Draft Questionnaires, PR99 (Sept. 10, 2021).

In November 2021, Commerce made an affirmative preliminary determination of critical circumstances for certain subject imports from Argentina.[5]  At that point, Plaintiffs were on notice that critical circumstances would potentially be an issue in the Commission's raw honey investigations.  It was therefore incumbent upon Plaintiffs to ask for additional information to be collected if they believed it necessary for the Commission's consideration of inventories, one of two statutory factors the Commission is to consider pertaining to critical circumstances.  In November 2021, the Commission had not yet sent out its questionnaires for the final phase of the investigations.  It issued those questionnaires nearly a month later, on December 21, 2021.  *See* Final Phase Questionnaire Transmittal Letter, PR108 (Dec. 21, 2021).

Plaintiffs were also on notice that the Commission was not using 2022 inventory data or any end user inventory information for its analysis of critical circumstances.  Plaintiffs cited the prehearing staff report's critical circumstances inventory tables ending in September 2021 in their prehearing brief, yet they did not argue for any additional data collection.  NHDPA Prehearing Brief, CR747, at Appendix A at 22 nn.63 & 64 (April 5, 2022).  *See also* Prehearing Report, INV-UU-031, CR744, at Table IV-9 (March 29, 2022) (table titled "Raw honey: U.S. importers' U.S. inventories of subject imports from Vietnam potentially subject to Commerce's preliminary affirmative critical circumstances determination, by date").  The Commission's final staff report, issued April 28, 2022, contained a similar table with more months of data ending with October 2021 data.  Final Staff Report, CR805, at Table IV-9.  Plaintiffs were therefore aware what inventory information the Commission would likely rely upon for critical

---

[5] Commerce's preliminary affirmative determinations of critical circumstances in its investigations of raw honey from Argentina and Vietnam were on November 23, 2021, and January 13, 2022, respectively.  86 Fed. Reg. 66,531 (Nov. 23, 2021); 87 Fed. Reg. 2,127 (Jan. 13, 2022).

circumstances, yet they did not ask for collection of later inventory data or any inventory data from end users.

Plaintiffs in fact had multiple opportunities to comment on any perceived absence of inventory data in these investigations – in their comments on the draft questionnaires, in their prehearing brief, at the hearing, in their posthearing brief, and in their final comments– yet Plaintiffs did not argue the Commission needed to collect more recent importer inventory data or end user inventory data.  Having not followed the Commission's rule concerning requests for new information, Plaintiffs are not permitted to raise these arguments on appeal.  *See Consol. Fibers, Inc. v. United States*, 32 CIT 855, 862, 574 F. Supp. 2d 1371, 1379 (2008) ("Plaintiffs thus failed to exhaust their administrative remedies with respect to the Commission's collection and analysis of pricing data and are barred from raising these issues on appeal.").  *See also Valeo N. Am., Inc. v. United States*, 404 F. Supp. 3d 1303, 1320 (Ct. Int'l Trade 2019) (discussing application of Rule 207.20(b) when party failed to request data collection in its comments on draft questionnaires).

### b. Plaintiffs Argue That the Commission Should Have Collected 2022 Inventory Data That Was Already in the Record

Plaintiffs argued in their posthearing brief to the Commission that they were providing the updated data they now argue to this Court should have been collected by the Commission. They attached an exhibit with monthly inventory data through March 2022 for eight importers and five packers and claimed that their data demonstrated that aggregate importer and packer inventories had declined.  NHPDA's Posthearing Brief, CR788, at 14 & Exhibit 3 ("numerous packers and importers" provided "certified inventory information").  The implication of Plaintiffs' argument to the Commission was that the record contained all needed inventory information— not that the Commission should gather more information.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Now Plaintiffs maintain the 2022 inventory data was missing from the record and should have been collected by the Commission.  On the other hand, Plaintiffs argue the information was actually in the Commission's record and should have been relied upon by the Commission. "The fact that *every importer, and most packers,* saw their inventory of Vietnamese honey substantially decrease from [███████████████████] provides contemporaneous evidence supporting exactly what the importers, packers, and end-users were informing the Commission . . . ." PBRat25 (emphasis added).

Plaintiffs cannot have it both ways.  They should not be permitted to raise arguments concerning the failure of the Commission to collect inventory data that they never asked to be collected, particularly when they argued to the Commission (and now to this Court) that the information was in the record.  *See Rhone Poulenc, Inc. v United States,* 899 F.2d 1185, 1191 (Fed. Cir. 1990).  In *Rhone Poulenc*, the Federal Circuit rejected appellant's argument that Commerce should have updated certain data underlying margin calculations because the argument had not been made before Commerce for tactical reasons.  The Court indicated that "it would have been unjust to the ITA and wasteful of public resources to allow Rhone Poulenc to belatedly raise the argument under these circumstances."  *Id.*  Similarly, here Plaintiffs argued to the Commission that the record contained inventory data from all importers and most packers, but they now unreasonably maintain this information needed to be collected.

### c.  Plaintiffs Misstate the Record Concerning End User Inventories

As with importers' inventories, Plaintiffs paint an inaccurate picture of end user inventories in the Commission's investigations.  They claim that "{a}lthough the Commission sought information on inventory levels from end-users, the requested information was with

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

regard to general inventory levels, and not the specific inventory levels *of the critical circumstances entries* . . . ." PBRat19.  This characterization of the record is not correct.

The Commission's purchaser questionnaires did not request inventory data, so purchasers such as [███████] and [████████] did not provide inventory data to the Commission. The Commission therefore did not have information on end user inventories unless the end users happened to also be U.S. producers or importers that completed domestic producer or importer questionnaires.  As noted however, no party asked the Commission to collect inventory data from purchasers or end users.

Regardless of exactly what inventory data Plaintiffs now claim should have been collected, having not made their arguments before the Commission, Plaintiffs did not exhaust their administrative remedies and should not be permitted to challenge the Commission's data collection before the Court.  *Jeld-Wen Inc. v. United States*, 567 F. Supp. 3d 1344, 1356-57 (Ct. Int'l Trade 2022); *Sandvik*, 164 F.3d at 599.  *See also* Scheduling Order (Oct. 3, 2022) Briefing Guidelines at 1b (ECF 23) (requiring exhaustion at agency level before raising an argument in an appeal).  The Court should not entertain Plaintiffs' shifting arguments concerning the collection of inventory data.

### E.  The Commission Did Not Need 2022 Inventory Information to Assess Inventories Under the Critical Circumstances Provision

#### 1.  The Commission Reasonably Relied on Inventory Information Covering Imports Prior to Imposition of Provisional Duties

Despite evidence cited by the Commission that shows importers' inventories rapidly increasing in the post-petition period, Plaintiffs claim that the Commission needed inventory data contemporaneous with the issuance of the antidumping duty order by Commerce in June 2022 to evaluate whether the order's remedial effect would be undermined.  PBRat12-15.  Plaintiffs essentially are arguing that the antidumping duty order's remedial effect did not begin until the

order was actually issued in June 2022, and this should be the time for the Commission's critical circumstances analysis.  Plaintiffs' argument is simply wrong.

First, Plaintiffs ignore that antidumping duties were applicable to entries after suspension of liquidation in November 2021— long before issuance of the antidumping duty order in June 2022.  Provisional antidumping duties are collected as of suspension of liquidation.  At that time, Customs and Border Protection begins suspending entries and collecting duties (*i.e.,* provisional measures) at the preliminarily-determined rate of dumping.  For raw honey from Vietnam, the deposit rate was over 400 percent.  86 Fed. Reg. 66,526 (Nov. 23, 2021).  This date is logically the date after which the antidumping duty order would be expected to begin having a remedial effect.  Duties had already been collected for over six months by the time the order was finally issued (November 23, 2021—June 10, 2022).

The antidumping duty orders also clearly state that duties are collected on or after suspension of liquidation on November 23, 2021, except for duties on raw honey from Vietnam which were made retroactive by 90 days from November 23, 2021, to August 25, 2021.  87 Fed. Reg. 35,501, 35,502 (June 10, 2021).  Thus, the antidumping duty orders are, by their own terms, applicable to duties after suspension of liquidation rather than after the date of issue.[6]  When duties begin to be collected is therefore the time that the order would normally begin having a remedial effect.

_____

[6] The antidumping duty orders state that for entries of raw honey from Argentina, Brazil, and India, the orders are effective as of November 23, 2021, the date of publication of the preliminary determinations in the Federal Register.  For raw honey from Vietnam, "antidumping duties will be assessed on unliquidated entries of raw honey from Vietnam entered, or withdrawn from warehouse, for consumption, on or after August 25, 2021, which is 90 days prior to the date of publication of the Vietnam Preliminary Determination."  87 Fed. Reg. 35,501, 35,502 (June 10, 2022).

Notwithstanding their current position that the order's issue date is the effective date of relief, Sweet Harvest argued to the Commission that provisional duties impacted import pricing long before the antidumping duty order was issued. Specifically, testimony at the hearing from Sweet Harvest indicated that provisional duties made subject imports from Vietnam more expensive. Hearing Tr. (Apr. 12, 2022), PR195, at 229-230 ("I alluded to the fact that we're importing honey even with the potential impact of 400 percent tariffs . . . . It's not just theoretical, we've actually foregone cheaper honey and brought in more expensive honey with the tariff in order to continue to meet their demands."). Plaintiffs also argue in their brief that the provisional duties effectively make imports "fairly traded," acknowledging their effect on imports. PBRat19-20.

Prior to when duties start to be collected is therefore the logical time for evaluation of the level of inventories for the Commission's critical circumstances analysis. This is why the Commission stated "{s}everal importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021." Views, CR813, at 71. The Commission has the discretion to apply any methodology that is reasonable under the facts of the case, and the Commission's use of inventory data from the end of October 2021 was a reasonable approach to measure inventories subject to Commerce's critical circumstances determination. *See JMC Steel Grp.*, 70 F. Supp. 3d at 1316 n.4.

Plaintiffs are therefore mistaken in repeatedly claiming there was "missing" or "outdated" inventory data or a "gap" in information. PBRat18-21. The Commission gathered inventory data contemporaneous with the *effective date* of relief. The data came from the time immediately before suspension of liquidation and the antidumping duties began to be collected.

Further, as described above, Plaintiffs attached the importer and packer inventory data from 2022 they claim was missing to their posthearing brief in an exhibit.

While it may be uncertain how quickly the inventories were consumed after November 2021, a period after the Commission's POI, the record showed, as the Commission found, that the timing and increased volume of imports, as well as the stockpiling of inventories prior to relief in November 2021, were aimed at evading the relief provided by the antidumping duties and were not driven by market conditions.  Views, CR813, at 72-73.  Indeed, Plaintiffs do not challenge any of the Commission's conclusions in this regard.

## 2. The Statute and Legislative History Support the Commission's Collection of Inventory Information from the Period Before the Effective Date of the Order

Plaintiffs argue both that the statute "specifically requires" evaluation of inventory data around the time of issuance of the order and that "the time period to be used in evaluating inventory levels is not specified in the statute."  PBRat14,18.  Both arguments are wrong.  In fact, the whole statutory scheme for critical circumstances for Commerce and the Commission is focused on imports and inventories prior to suspension of liquidation when duties start being collected.

The statute and legislative history indicate what inventories the Commission is to consider and when they are to be considered.  As discussed, the statute instructs the Commission to consider the timing and volume of imports and the rapid increase in inventories of the imports that are subject to Commerce's affirmative critical circumstances determination.  "{T}he final determination of the Commission shall include a finding as to whether *the imports subject to the affirmative determination under subsection (a)(3)* are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title."  19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added).  Commerce makes its determination of critical

27

circumstances with respect to imports in the post-petition period prior to suspension of liquidation. *See, e.g.,* SAA at 876 (Commerce examines whether "there have been massive imports of the subject merchandise over a relatively short period of time (*i.e.,* a surge of imports) prior to the suspension of liquidation"). This is what Commerce did in its investigation of raw honey from Vietnam when it examined imports during a post-petition period that ended in November 2021. *See* 87 Fed. Reg. 2,127, 2,129 (Jan. 13, 2022) (preliminary determination of critical circumstances for Vietnam); 87 Fed. Reg. 22,184, 22,185 (Apr. 14, 2022) (final determination of critical circumstances). Following the statute, the Commission likewise makes its critical circumstances determination with respect to imports and inventories in the post-petition period prior to suspension of liquidation.

The statute provides additional guidance to the Commission, directing it to consider whether there has been "a rapid increase in inventories of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii)(II). The Commission must therefore evaluate the *increase* in inventories of the imports subject to Commerce's determination. The statute does not direct the Commission to evaluate the remaining level of inventories subject to Commerce's determination several months later when Commerce finally issues the antidumping duty order. The statute's specific reference to the increase in inventories indicates the Commission should evaluate their increase prior to provisional duties and not the manner in which the inventories are later sold.

If the statutory scheme for Commerce and the Commission were not clear enough, the SAA confirms that the *effective date* of the antidumping duty order, rather than its issuance date, is the proper time for the Commission's analysis. "Critical circumstances determinations focus on whether an order's effectiveness is undermined by increasing shipments prior to the *effective date of the order*." SAA at 877 (emphasis added). Similarly, the SAA states that the

Commission is required to determine "whether, by *massively* increasing imports prior to the *effective date* of relief, the importers have seriously undermined the *remedial effect* of the order." *See* SAA at 877 (emphasis added).[7]  The SAA's reference to "massively increasing imports prior to the effective date" tracks its discussion of Commerce's examination of "massive imports" prior to suspension of liquidation.  SAA at 876-77.  Thus, the SAA confirms that the effective date of the antidumping order means when duties were first collected, and this is when the order would be expected to begin having a remedial effect.  Further, in another context, when discussing the possibility of improvement in the condition of the industry due to the pendency of antidumping and countervailing duty investigations, the SAA recognizes the relief afforded by provisional measures.  "The imposition of provisional duties, in particular, can cause a reduction in import volumes and an increase in prices of both the subject imports and the domestic like product."  SAA at 854.  Plaintiffs' arguments that the remedial effect of the antidumping duty order begins when it is issued is not supported by either the statute or the SAA.

The Commission therefore made its findings concerning imports and inventories in the post-petition period prior to suspension of liquidation and imposition of provisional duties.  It did not consider entries during later months when entries were not subject to Commerce's finding of critical circumstances but would be subject to antidumping duties.  This is precisely what the Commission did when it found "almost a threefold increase" in inventories prior to suspension of liquidation and preliminary duties.  Views, CR813, at 70-71.

---

[7] The language quoted above from the SAA appears in nearly 100 Commission critical circumstances determinations (by Westlaw's count) indicating that it has consistently been the effective date of relief that is important in the Commission's analysis.

3.  **Declines in Inventories After Suspension of Liquidation Do Not Show the Order's Remedial Effect Was Not Likely to be Undermined**

Plaintiffs further argue that it is possible that the inventories of raw honey from Vietnam

that the Commission found had been stockpiled at the end of October 2021 were consumed by

the time of the issuance of the antidumping order in June of 2022.  PBRat15-17.  They contend

such a later decline in inventories would undermine the Commission's analysis of the increase in

inventories.

The problem with Plaintiffs' arguments concerning subsequent declines in inventories is

that they are premised on the antidumping duty order not being effective before its issue date.

As explained, however, provisional duties began in November 2021, and this is when the

antidumping duty order was effective and would have a remedial effect.  Hence, any declines in

importers' inventories in 2022 only show that inventories were being sold off *after* the effective

date of the order.  Because duties were already being collected, declines in importer inventories

do not mean that the order's remedial effect was not being undermined.  Therefore, contrary to

Plaintiffs' argument, the Commission did not need to track those stockpiled inventories after

November 2021.  It knew that the October 2021 inventories would be sold after the order's

effective date of relief in November 2021.

Whether those excess inventories of raw honey from Vietnam in October 2021 were all

consumed or remained in the supply chain in June 2022, they had an effect in the marketplace

undermining the effectiveness of the order or would have an effect in the marketplace

undermining the order.  To the extent the inventories were sold off, they affected prices and

captured sales that may have gone to the domestic industry.  To the extent the raw honey

remained in the inventory of importers, packers, or end users, the raw honey represented

potential future lost sales and depressed prices.  If end users were holding the raw honey from

Vietnam, then their demand would be reduced because they did not need to purchase raw honey from other sources such as the domestic industry.

While the Commission addressed Plaintiffs' arguments concerning 2022 inventories, Plaintiffs are correct that instead of relying on March 2022 information, the "Commission instead continued to rely on inventory levels that ended as of October 2021." PBRat20. Plaintiffs describe it as "inexplicable" that later inventory data was not relied upon rather than data from October 2021. It is only inexplicable if you ignore that duties began to be collected in November 2021 and the whole critical circumstances analysis for Commerce and the Commission focuses on imports and inventories prior to suspension of liquidation and provisional duties.

Inventory data for 2022 were also unnecessary given the evidence in the record concerning apparent U.S. consumption, shipments, and imports during January 2021 to September 2021. As the Commission explained, while apparent U.S. consumption was higher in interim 2021, importers' shipments of raw honey from Vietnam were only slightly higher. "While apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that does not explain why importers would sharply increase their imports from Vietnam during the post-petition period." Views, CR813, at 72.

The Commission therefore reasonably concluded that the imports and inventories of honey from Vietnam were not for immediate consumption and likely to remain in the supply chain. Views, CR813, at 73 & n.305. This is a reasonable inference given the undisputed surge in imports and inventories of raw honey from Vietnam prior to suspension of liquidation along with the timing of the imports which, as the Commission observed, indicated an intention to

avoid retroactive duties.  Regardless of how those inventories of raw honey from Vietnam were sold after November 2021, they were likely undermining the effectiveness of the order.

### 4. The Commission Reasonably Did Not Collect Post-POI Inventory Data

Plaintiffs assert that the Commission should have tracked the inventories of raw honey from Vietnam and their consumption by end users to see how quickly the honey was consumed after duties began to be collected in November 2021.  PBRat15-17.  As explained, the Commission did not need that information to conclude that the inventories would be sold and likely undermine the remedial effect of the order after suspension of liquidation in November 2021.  Furthermore, as discussed, Plaintiffs never asked the Commission to collect any 2022 inventory data or any inventory data from end users or purchasers.

An additional problem with Plaintiffs' argument is that collecting 2022 data is incompatible with the Commission's final phase investigations which utilized a POI ending in September 2021.  Although Plaintiffs argue at length that the Commission should have collected inventory information from importers and end users "contemporaneous" with the issuance of the antidumping duty order in June 2022, this period was long after the end of the POI and the effective date of the order.  PBRat3,11-12,20,22,24-25,28,35.

The Commission of course operates under statutory deadlines.  The Commission's final determinations in the raw honey investigations were due on May 31, 2022, 45 days after Commerce's final determination.  87 Fed. Reg. 22,184, 22,186 (April 14, 2022).  Nonetheless, pursuant to statute and the Commission's rules, the parties must be permitted to comment on the information collected in the staff report as well as other information submitted to the Commission before it makes its final determinations.  *See* 19 U.S.C. § 1677m(g).  *See also* 19 C.F.R. § 207.30 (rule providing for release of information to parties and opportunity to

comment).  Because of the statutory requirement and in the interest of fairness to the parties, the Commission schedules final investigations so that parties can receive information and comment on it in their prehearing and posthearing briefs and final comments.  The Commission also schedules a hearing in its final investigations, which it is required to hold upon request.  *See* 19 U.S.C. § 1677c.

With the Commission's determinations due at the end of May 2022, staff issued a prehearing staff report on March 29, 2022.  The prehearing staff report contained information collected in the investigations for the parties' use in their prehearing and posthearing briefs and at the hearing.  The Commission's prehearing report utilized a POI from January 2018 to September 2021.  *See* Prehearing Report, CR744, at Table C-2.  The parties and Commission were able to examine trends in apparent U.S. consumption, the domestic industry's financial and trade indicators, raw honey prices, imports, shipments of imports, inventories of domestic product, inventories of imports as well as other data over the POI.  Much, but not all the information, is shown in appendix C of the staff report, which presents data for January 2018 to September 2021.

The Commission would have collected data for all of 2021 (and not used an interim period ending in September 2021) if that were possible because full-year data are preferable to the use of interim periods.  *See Am. Spring Wire v. United States*, 8 CIT 20, 26, 590 F. Supp. 1273, 1279 (1984) ("{T}he ITC is not required by the statute to use any particular timeframe for its analysis, although it generally focuses on annual time periods.").  However, firms could not provide full-year 2021 data in time for it to be incorporated into the prehearing report.  The Commission, therefore, would not have been able to collect mid-year 2022 data if firms could not even provide full-year 2021 data.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**5.   The Commission Reasonably Did Not Collect Data From End Users**

The Commission's decision not to seek end user data is also reasonable given how the raw honey market works.  Plaintiffs wrongly argue that tracking inventories of subject imports from Vietnam to end users would have been straightforward because end users are big food processors such as [          ].  However, "{a}lmost all honey is blended" and comes from a variety of sources including different countries.  Final Staff Report, CR805, at II-16.  [      ], the firm cited by Plaintiffs as a large end user of raw honey from Vietnam, is a good example.  It reported that it purchased a [                    ].  Final Staff Report, CR805, at Table V-15.  Other big users such as [          ] also reported purchasing blends of raw honey from different sources, including different countries.  Hearing Tr. (April 12, 2022), PR195, 224-26 (Bash, Haines and Bertrand).  Furthermore, the food service portion of the market uses honey from Vietnam.  *See* NHPDA's Prehearing Brief, CR747, at 31 ("{I}mports of light and dark amber honeys from Vietnam and India primarily meet the demand in the Ingredient and Food Service segments.").  The Commission could not have obtained meaningful data by sending questionnaires to a few big end users, as Plaintiffs suggest.

The Commission sent out purchaser questionnaires, as is routine in final investigations, but as noted, purchasers are not necessarily end users.  Sixteen of 21 responding purchasers reported purchasing raw honey from Vietnam, but only four of 21 responding purchasers were end users.  *See* Final Staff Report, CR805, at II-2 & n.10.  To obtain end user information, the Commission would have needed to send out questionnaires specifically seeking information from end users it had identified rather than simply adding questions to its purchaser questionnaires.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Importers also are not typically selling to end users, making tracking the honey more difficult. The largest importer of raw honey from Vietnam during 2020 was [███████████ ██]. Final Staff Report, CR805, at Table IV-1. Its three biggest purchasers were [████ ████████████████████████████████████], accounting for over [███] its purchases in 2020. [████████] U.S. Importer Questionnaire Response, CR541, at III-21. These purchasers blend and pack raw honey from different sources and sell the blended honey downstream until it reaches end users. Packers and importers are blending honey from different sources and end users would not necessarily know what blend of honey they had in inventory. As a result, tracking imports of raw honey from Vietnam downstream until it ultimately is consumed is not as simple as sending questionnaires to end users. End users also would not necessarily know when the honey they purchased was imported (*i.e.,* whether it was imported before or after suspension of liquidation). In any event, no party asked that any end user inventory information be collected during the POI, and the Commission acted reasonably in not seeking data from end users.

### F. Other Information in the Record Supports the Commission's Affirmative Critical Circumstances Determination

#### 1. The Commission's Additional Unchallenged Findings Support Its Affirmative Critical Circumstances Determination

In addition to the timing and volume of imports and increase in inventories, the statute provides that the Commission may consider "other factors it believes to be relevant" to whether the remedial effect of the order will be undermined. 19 U.S.C. § 1673d(b)(4)(A)(ii). The Commission accordingly emphasized additional factors it believed supported its finding that the antidumping duty order would be seriously undermined.

The Commission found that prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the

petitions and the pendency of the investigations.  Unlike subject imports from Argentina however, subject imports from Vietnam continued to undersell the domestic like product by wide margins during the second and third quarters of 2021.  Views, CR813, at 71.

The Commission further found that the industry condition remained weak in interim 2021.  It continued to report losses even with higher prices in interim 2021.  Its operating expenses-to-net sales ratio remained over 100 percent.  The industry's shipments declined, and it continued to lose market share.  Views, CR813, at 74.  The poor condition of the industry and the continued underselling by subject imports from Vietnam further indicated that the relief provided by the antidumping duty order was likely to be undermined by the large volumes of subject imports from Vietnam that were underselling the domestic product despite the pendency of the investigations.  Views, CR813, at 74.

As with the timing and volume of imports and the rapid increase in inventories of raw honey from Vietnam before suspension of liquidation, none of these findings is disputed by Plaintiffs.  They constitute substantial evidence supporting the Commission's affirmative determination of critical circumstances.

## 2.  The Record Belies Plaintiffs' Claim of Domestic Industry Shortages

Plaintiffs additionally argue that the Commission "erred by entirely ignoring" evidence indicating that the domestic industry had "severe shortages."  PBRat29-30.  Plaintiffs' claims do not withstand scrutiny.

Plaintiffs cite hearing testimony and quote the prehearing report's description of supply constraints and petitioner Sioux Honey's declaration of a *force majeure*.  PBRat30-31 (citing Prehearing Staff Report, CR744, at II-9).  The implication of Plaintiffs' argument is that petitioner was experiencing production problems causing shortages of domestic raw honey in the

36

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

market.  The record shows otherwise.  As the Final Staff Report explains, the *force majeure* was not the result of shortages of domestically produced honey.  Rather, it resulted from "[███ ████████████████████████████████████████████]."  Final Staff Report, CR805, at II-9 n.21 (emphasis added).

Plaintiffs' highlighting of portions of [████████] questionnaire response also does not tell the whole story.  It is true that [███████████████████████████████████████ ████████████████████████████████].  PBRat31 (citing [████████] U.S. Purchaser Questionnaire, CR509, III-13 (Feb. 3, 2022)).  But Plaintiffs overlook that [████ ███████████████████████████████████████████████████████████████ ████████].  *Id.* at III-13(b).  This statement is consistent with the import quality problems referenced in the Staff Report.  Final Staff Report, CR805, at II-9 n.21.  Moreover, Sioux Honey provided an affidavit describing a [███████████████████████████████████████ █████████████████████████████].  Petitioners' Prehearing Brief, CR746, Exhibit 4, Blumenthal Affidavit ¶¶ 25-26.

None of this evidence relied upon by Plaintiffs to show "severe shortages" even pertains to domestically produced honey.  Plaintiffs cite *Altx Inc. v. United States*, 25 CIT 1100, 1103, 167 F. Supp. 2d 1353, 1359-60 (2001) for the proposition that the Commission should not ignore a contradictory Staff Report analysis that was brought to the Commission's attention by a party. The Court in *Altx* recognized that the Commission is not bound by staff's conclusions or analysis in the Staff Report provided the Commission's departure from the analysis is explained.  *See also Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1058-59 (1995).  Here, however, Plaintiffs misconstrue the Staff Report's discussion of a purchaser's problem with imported raw

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

honey to show the domestic industry was experiencing shortages.  Final Staff Report, CR805, at II-9 n.21.[8]

Plaintiffs also quote the Staff Report's statement that six domestic producers and 14 importers reported supply constraints after the petitions were filed, claiming it shows "the U.S. industry was, by the time of the final phase of the investigations, experiencing severe shortages." PBRat30 (citing Prehearing Staff Report, CR744, at II-9).  However, Plaintiffs overlook that 46 producers (beekeepers) and 24 importers responded to the question.  Final Staff Report, CR805, at II-9.  Viewed in context, the reports of supply constraints by only six of 46 responding beekeepers do not support Plaintiffs' claims of severe shortages of domestic raw honey.[9]  Indeed, a much greater portion of importers (14 of 24), than domestic producers (6 of 46), reported supply constraints after the filing of the petitions.  Final Staff Report, CR805, at II-9.

Plaintiffs argue drought conditions and lower inventories of domestically produced raw honey in 2021 support its claims of shortages.  PBRat31.  Plaintiffs' point regarding inventories must be viewed in context because "U.S. producers have relatively large inventories."  Final Staff Report, CR805, at II-40.  This is most apparent when the domestic industry is compared to the subject industries.  *See Id.* at Table II-3.  The domestic industry's ratio of inventories to U.S.

---

[8] Plaintiffs rely exclusively on the prehearing report in their brief.  The prehearing report is not the final version of the staff report in investigations, and information often is updated and revised in the final staff report as was the discussion cited by Plaintiffs.  *Compare* Final Staff Report, CR805, at II-9 n.21 *with* Prehearing Staff Report, CR744, at II-9.  The prehearing report generally is for use in the parties' briefs to the Commission, but it usually is not used by the Commission in its final determinations.

[9] Plaintiffs also cite purchaser [████████] comment quoted in the staff report about forward pricing problems causing supply constraints.  Again, this evidence does not necessarily apply to domestic honey as [██████] is a major purchaser of imported honey.  *See* PBRat31 (citing Prehearing Report, CR744, at II-9.).  Forward pricing for the subject imports was likely affected by provisional duties that began in November 2021.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

shipments was equivalent to [    ] percent of total shipments in 2020.  The subject industries'

average ratio was just [    ] percent in 2020.  *Id.*

The record additionally showed that large domestic beekeepers were holding raw honey

in inventory because prices were so low from 2018 to 2020.[10] "[                         ]

domestic producer, [        ], and [                ] declined to sell their honey or found that

packers were no longer interested in their honey due to low market prices."  Views, CR813, at 52

n.221 (citing Final Staff Report, CR805, at VI-13 to VI-14).  The result was that "U.S.

producers' reported level of inventories increased during the POI, which, as a ratio to U.S.

producers' U.S. shipments, increased from [    ] percent in 2018 to [    ] percent in 2019 and

to [    ] percent in 2020."  Views, CR813, at 52.  The industry then sold off inventory in 2021

as prices recovered.  Final Staff Report, CR805, at VI-13 to VI-14.

Plaintiffs also argue that drought conditions resulted in lower raw honey production in

interim 2021 and widespread shortages.  PBRat31.  Notwithstanding lower raw honey production

in interim 2021, the industry's inventories remained elevated at [    ] percent of U.S. shipments.

Final Staff Report, CR805, at C-7 (Large Producer Data).  Plaintiff NHPDA even argued to the

Commission that the domestic industry was holding extra inventories in anticipation of higher

prices after the filing of the petitions in 2021.  *See* Views, CR813, at 52 n.221 (citing Hearing

Tr., (April 12, 2022), PR195 at 253 (Campbell)).  Given that the domestic industry held

relatively high inventories in 2021, Plaintiffs' arguments that such inventories demonstrated a

shortage of domestic honey cannot withstand scrutiny.

---

[10] The Commission found that domestic producers were holding excess inventories
because prices were so low during most of the POI.  Views, CR813, at 52 n.221.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

### 3.   The Commission Addressed Other Evidence Plaintiffs Claim Was Ignored

Plaintiffs further claim that the Commission ignored Sweet Harvest's "sworn testimony and an affidavit" refuting claims that it held large inventories of raw honey from Vietnam. PBRat29.  The Commission, of course, does not have to address each piece of evidence in the record as long as its reasoning is reasonably discernible.  *See Valeo*, 404 F. Supp. 3d at 1319. But in this case, Plaintiffs' claim is wrong because the Commission discussed the evidence Plaintiffs cite.  The Commission observed that [████████████████████████████ ████████████████████████████████████████ ████████████████████████████] Views, CR813, at 73-74 n.306 (quoting NHPDA's Posthearing Br., CR 788, at Ex. 4 ¶ 14 (Nubern Affidavit)).  However, the Commission found that its claim was [████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███].″  Views, CR813, at 73-74 n.306.  Thus, the Commission did not "ignore" [████ ████] testimony at all.  While Plaintiffs continue to claim [████████] inventories were [████████████], their [████████████████████████████████████ ████████████████████████].  *See* PBRat29.

Plaintiffs similarly claim that the Commission completely ignored the issue of end users holding honey, claiming that "the Majority did not even acknowledge that these arguments were presented to it, let alone respond to them in the final determination."  PBRat27.  Again, this is simply not true. The Commission mentioned the dispute concerning end users' holdings of raw honey, but the record did not have information concerning these holdings.

> As to raw honey held downstream, we note that the Ingredient Purchasers fully participated in the final phase of these

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*



investigations, yet ████████████████████████████████████████ , one of the Ingredient Purchasers who participated in the final phase of these investigations.

Views, CR813, at 74 n.306.  Thus, the Commission specifically discussed the issue, contrary to Plaintiffs' claim.  *See also* Views, CR813, at 63 & n.267 (noting petitioners' arguments).  In any case, as Plaintiffs acknowledge, the honey could still have an effect in the marketplace even if not held by importers as long as it had not been consumed.  PBRat14 ("{T}o have a post-import effect, logically, the critical circumstances entries must be in the inventory of the importers, the packers, or the end-users.").  So, despite Plaintiffs' arguments concerning end user inventories, Plaintiffs concede the Commission did not even need to know precisely who was holding the raw honey.

### 4.  The Commission Found Raw Honey from Vietnam and Domestically Produced Raw Honey Compete for Sales in the U.S. Market

Plaintiffs claim the evidence was "uncontradicted" that raw honey from Vietnam and domestically produced raw honey do not compete.  In fact, the Commission found they did compete during the POI.  Views, CR813, at 22-27, 36-38, 58-59, 58 nn.248 and 250.  Plaintiffs overlook the Commission's extensive discussion and findings bearing on the degree of competition.  PBRat33-35.

Plaintiffs first manipulate the data by comparing the share of shipments of raw honey from Vietnam that was *light amber or darker* ([████] percent) with the share of shipments of domestically produced honey that was *amber or darker* [██] percent to argue that there was no overlap in shipments of honey types.  PBRat33-34.  In fact, the share of domestically produced honey that was *light amber or darker* was 20.1 percent in 2020.  *See* Final Staff Report, CR805,

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

at Table IV-10.  The 20.1 percent figure for *light amber or darker* shipments of domestically produced honey is appropriately compared to the [ ■ ] percent of *light amber or darker* shipments of raw honey from Vietnam.  The Commission also discussed the overlap, observing that large producers' U.S. shipments were between 18 and 20 percent light amber from 2018 to 2020.  Views, CR813, at 58 n.248.

Plaintiffs next assert that product from Vietnam is required in the market because of its dark color. However, over half of the product from Vietnam was of light amber honey during the POI, a product the domestic industry produces.  *See* Views, CR813, at 58 n.248; Final Staff Report, CR805, at Tables E-1 & E-5.

Plaintiffs also erroneously state that "the record demonstrates that [ ■ ] percent of the Vietnamese raw honey is the dark amber that most bakers rely upon . . . ."  PBRat34.  The [ ■ ] percent figure is not even close to being correct.  The Commission requested data for amber or darker honey, a category that includes dark amber honey.  Only [ ■ ] of shipments of raw honey from Vietnam were amber or darker colored, a category that includes dark amber, so the percentage that was dark amber was must have been even smaller.  Final Staff Report, CR805, at Table IV-10.  Plaintiffs' efforts to obscure the record before the Commission should be rejected.

Plaintiffs further argue that darker colored raw honey in general, and darker raw honey from Vietnam in particular, is needed by certain food manufacturers.  PBRat33-35.  The Commission found that the Ingredient Purchasers purchased low-priced blended honey from multiple countries.  Rather than particular flavors, the greater availability and lower prices of the subject imports primarily accounted for the Ingredient Purchasers' purchases.  Views, CR813, at 58-59 & nn.248 & 250.  Plaintiffs do not address the Commission's findings or the evidence it cited in support of its findings.

Moreover, Plaintiffs have not appealed the Commission's determination of material injury by reason of subject imports from Vietnam.  That determination is incompatible with Plaintiffs' contention that there is no competition between subject imports from Vietnam and domestically produced raw honey.  Plaintiffs also did not argue to the Commission that there was no reasonable overlap of competition between subject imports from Vietnam and domestically produced raw honey so that the Commission would not cumulate subject imports from Vietnam.  Views, CR813, at 21.  The Commission nonetheless extensively discussed the degree of fungibility and the overlap of competition between and among raw honey from different sources, including raw honey from Vietnam.  Views, CR813, at 22-27.  The Commission also discussed in detail the level of substitutability of raw honey from different sources.  Views, CR813, at 36-38.

Other than generally claiming that subject imports from Vietnam do not compete with domestically produced raw honey, Plaintiffs do not challenge *any* of the Commission's findings or the evidence it relied upon pertaining to the level of competition between raw honey from Vietnam and domestically produced raw honey.  Plaintiffs' unsupported claim that the Commission ignored the record when it specifically addressed Plaintiffs' arguments should therefore be rejected.  Having not challenged the Commission's pertinent findings or the evidence it relied upon, Plaintiffs' arguments concerning the level of competition are unpersuasive.

## G.  The Findings of a Dissenting Commissioner Have No Bearing on the Court's Review of the Commission's Findings

Throughout their brief, Plaintiffs discuss at length the factual findings of the dissenting Commissioner but avoid discussing the evidence supporting the Commission's findings.[11]  *See, e.g.*, PBRat6-8.  Plaintiffs' reliance on Commissioner Johanson's separate views in support of its challenge to the Commission's determination arguments is misplaced.  That the dissenting Commissioner, this Court, or Plaintiffs, may have weighed the evidence differently, does not provide grounds to overrule the Commission's determination.  Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'"  *Siemens Energy, Inc. v. United States*, 806 F. 3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (citing *Consolo*, 383 U.S. at 619-20).

Plaintiffs' numerous efforts to have the Court compare the dissent's findings with those of the Commission (or to ignore the Commission's findings entirely) is simply another way of asking the Court to reweigh evidence.  *See Metallverken Nederland B.V. v. U.S.,* 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989) ("In asking the Court to negate a commissioner's

---

[11] Reading the "Procedural Background and Determination under Review" section of Plaintiffs' brief, it is apparent that Plaintiffs believe that Commissioner Johanson's findings are highly relevant to their appeal.  Plaintiffs provide a detailed description of his findings and do not mention the Commission's findings at all.

determination based upon the findings of dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the evidence.").

For instance, with respect to rapid increase in inventories prior to the order's effective date, Plaintiffs do not address the data supporting the Commission's finding and instead point to different information indicating that importers' inventories were sold after the order's effective date. PBRat24-25. The Commission explained why it found it likely that the increased inventories before suspension of liquidation were not for immediate consumption. *See* Views, CR813, at 73 n.305. The support included the timing of the imports, the near tripling of inventories, consumption patterns, and inelastic demand. Plaintiffs simply ignore the Commission's findings. Plaintiffs similarly cite the dissent's findings concerning drought conditions and inventories of domestically produced raw honey being lower at the end of 2021 than any other time of the POI. PBRat31. As discussed *infra* at Section F.2 however, the record did not show shortages or low inventories of domestically produced raw honey in 2021.

Plaintiffs' recitation of the dissent's findings and failure to challenge or even acknowledge the Commission's findings demonstrate their failure to appreciate the standard of review applicable to this appeal. *See Maverick Tube Corp. v. United States*, 37 ITRD 2829, 2016 WL 703575, at *7 (Ct. Int'l Trade Feb. 22, 2016) ("In the final analysis, the question is solely whether the agency's determination is supported by substantial evidence on the record and is in accordance with law."), *aff'd,* 857 F.3d 1353 (Fed. Cir. 2017).

### H. The Commission Exhaustively Collected Data Necessary for Its Critical Circumstances Determinations

Notwithstanding the extensive record that shows otherwise, Plaintiffs argue that the Commission did virtually no investigation of critical circumstances in its final phase investigations. Plaintiffs state that "the Commission gathered nearly all of the required import

and inventory information right before the issuance of its Preliminary Determination in November of 2021." Plaintiffs then say that they "do not dispute that the information gathered during the preliminary investigation regarding import levels was useful for determining the 'timing and value {sic} of the imports,' as required by the statute." PBRat13. *See also* PBRat12 ("{T}he inventory data regarding the critical circumstances entries for importers and packers only is updated through October of 2021 (*i.e.*, it only covers the preliminary phase of the investigation) . . . ."). All these statements indicate that Plaintiffs are confused about how the Commission conducted its investigation. The Commission gathered all its information for critical circumstances in the final phase of its investigations, and it gathered none in the preliminary phase before petitioners had even made critical circumstances allegations.[12]

First, the Commission issued its preliminary determination in June 2021, not November 2021 as Plaintiffs incorrectly state. Final Staff Report, CR805, at Table I-1; 86 Fed. Reg. 30,980 (June 10, 2021), PR76 (Comm'n Notice of Preliminary Determinations). But more importantly, the Commission's information concerning imports and inventories for critical circumstance was not gathered in its preliminary investigations. The Commission's preliminary phase investigations only collected questionnaire data up until December 31, 2020. *See Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam,* Inv. Nos. 731-TA-1560-1564 (Preliminary), USITC Pub. 5204, PR84, at Table C-1 (June 2021).

_____

[12] Petitioners filed their critical circumstances allegations with respect to raw honey from Argentina in October 2021 and with respect to raw honey from Vietnam in December 2021. 86 Fed. Reg. 66,531, 66,532 (Dep't of Comm.) (Nov. 23, 2021) (Argentina); 87 Fed. Reg. 2,127, 2,127 n.2 (Dep't of Comm.) (January 13, 2022) (Vietnam). Accordingly, the Commission would not have collected information concerning critical circumstances in the preliminary phase ending in June 2021 before petitioners' allegations.

The Commission issued its final phase questionnaires collecting information from importers on December 21, 2021, to be returned to the Commission by February 1, 2022.  These questionnaires requested data from January 1, 2018 through September 30, 2021.[13]  Furthermore, the Commission's data-gathering in its final phase investigations continued after February 1, 2022 because on January 13, 2022, Commerce made its preliminary affirmative critical circumstances determination with respect to subject imports from Vietnam.  87 Fed. Reg. 2,127.  The Commission wanted more detailed information concerning the inventories of imports subject to the Commerce' affirmative critical circumstances determinations, so it sent supplemental questionnaires to U.S. importers to be returned by April 19, 2022.  *See, e.g.*, Sweet Harvest's Supplemental U.S. Importers' Questionnaire, CR779, at 1 and I-3.  The supplemental questionnaires requested more extensive end-of-period monthly inventory data (April 2021-October 2021) from the pre-petition period prior to the effective date of the order in November 2021.  Notwithstanding Plaintiffs' claims, the Commission conducted a thorough and comprehensive investigation related to critical circumstances in the final phase of the investigations, even sending supplemental questionnaires to assure every detail was covered.

## V.     Conclusion

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Judgment on the agency record and affirm the Commission's critical circumstances determination in all respects.

---

[13] Some data from public sources such as official import statistics included December 2021 data.  Final Staff Report, CR805, at Table IV-13.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

/s/ Andrea C. Casson
Andrea C. Casson
Assistant General Counsel for Litigation

/s/ Michael K. Haldenstein
Michael K. Haldenstein
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3041
Facsimile: (202) 205-3111
michael.haldenstein@usitc.gov


*Attorneys for Defendant United States International Trade Commission*


Dated: March 10, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to this Court's Scheduling Order 1(f) and Chambers Procedures 2(B)(1) and (2),

I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL**

**TRADE COMMISSION'S PUBLIC MEMORANDUM IN OPPOSITION TO**

**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

contains <u>13,936</u> words, according to the word-count function of the word processing system used

to prepare this brief (Microsoft Office 365 ProPlus).


Dated: March 10, 2023                              */s/ Michael K. Haldenstein*
                                                    Michael K. Haldenstein
                                                    Attorney-Advisor
                                                    Office of the General Counsel
                                                    U.S. International Trade Commission
                                                    500 E Street, SW
                                                    Washington, DC 20436
                                                    Telephone: (202) 708-1529
                                                    Facsimile: (202) 205-3041
                                                    michael.haldenstein@usitc.gov