UNITED STATES COURT OF INTERNATIONAL TRADE

SWEET HARVEST FOODS,

*Plaintiff,*

and

EXPORT PACKERS COMPANY LIMITED, HONEY
HOLDING I, LLP DBA HONEY SOLUTIONS, SUN-
LAND TRADING, INC., NATIONAL HONEY PACK-
ERS & DEALERS ASSOCIATION (NHPDA),

*Consolidated Plaintiffs,*

v.

UNITED STATES OF AMERICA,

*Defendant,*

and

AMERICAN HONEY PRODUCERS ASSOCIATION,
and

SIOUX HONEY ASSOCIATION,

*Defendant-Intervenors.*

Before: Leo M. Gordon, Judge

Consol. Case No. 22-00188

## CONSOLIDATED PLAINTIFFS' REPLY BRIEF

May 16, 2023

**NON-CONFIDENTIAL**

Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300

Counsel for Sweet Harvest Foods, Export
Packers Company Limited, Honey Hold-
ing I, LLP dba Honey Solutions, and
Sunland Trading, Inc.

TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  BOTH DEFENDANT AND DEFENDANT-INTERVENORS ADVANCE A STATUTORY
    CONSTRUCTION THAT IS CONTRARY TO THE PLAIN LANGUAGE OF THE
    CRITICAL CIRCUMSTANCES PROVISION AND THE LEGISLATIVE HISTORY ................... 2

    A.  The Statute Plainly States that the Entries "Subject to the
        Department's Affirmative" Critical Circumstances Finding Are
        Exactly the Same as the Entries Where Liquidation Is Suspended
        Ninety Days Early ............................................................................. 3

    B.  The Statute, the Legislative History, and Recent Precedent of this
        Court Establish that the "Remedial Effect of the Order to Be Issued"
        Begins When the Order is Issued, Not When Provisional Measures
        Are Imposed .................................................................................... 7

        1.  The Statute and the Legislative History Both Direct the
            Commission To Evaluate Whether the "Antidumping Duty
            Order To Be Issued," Not the Provisional Measures Already in
            Place, Would be "Undermined Seriously" ........................................ 7

        2.  The *MTD Products* Determination Confirms that Defendant
            and Defendant-Intervenor Have Advanced a Flawed Statutory
            Construction .............................................................................. 11

III.  THE COMMISSION SHOULD HAVE EXAMINED EVIDENCE DEMONSTRATING
     THAT ALL OR NEARLY ALL OF THE CRITICAL CIRCUMSTANCES INVENTORIES
     WERE SOLD OFF BEFORE THE ISSUANCE OF THE ANTIDUMPING DUTY ORDER,
     AND THUS NOT IN A POSITION TO "UNDERMINE SERIOUSLY" THE "REMEDIAL
     EFFECT OF THE ANTIDUMPING DUTY ORDER TO BE ISSUED" ........................... 14

    A.  Arguments that the Commission Did Not Need to Consider Any Data
        After the Suspension of Liquidation Rely on the Flawed Statutory
        Claim that the "Remedial Effect" of an Antidumping Duty Order
        Begins When Liquidation Is Suspended ............................................. 15

    B.  The Record Contained Sufficient Inventory Data to Allow the
        Commission to Evaluate Whether the Critical Circumstances Entries
        Were Still in the Supply Chain or Had Been Consumed ........................ 15

    C.  Defendant's Attempts to Rehabilitate the Commission's Deficient
        Factual Analysis Fail .................................................................... 17

IV.  CONCLUSION ................................................................................... 20

TABLE OF AUTHORITIES

**Federal Cases**

*MTD Products, Inc. v. United States*, Slip Op. 23-34 (Mar. 16, 2023)……………………10-13

**Federal Statutes and Legislative History**

19 U.S.C. § 1673, *et seq*.…………………………………………………………...…2, 4, 5, 8

**Federal Statutes and Legislative History**

H.R. Rep. 103-316, Vol. I at 877) (1994) (Statement of Administrative Action)  …………… 8

**Federal Regulations**

19 C.F.R. § 351.206 …………………………………………………………………… 5

Int'l Trade Administration, "Antidumping Duties; Countervailing Duties," 62 Fed. Reg. 28,296, 27,316 (May 19, 1997)…………………………………………………………………9

**Federal Agency Determinations**

Dep't of Commerce, "Raw Honey from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair Value Investigation," 87 Fed. Reg. 2127, 2129 (Jan. 13, 2022)  …………………………………………………… 4, 6

Small Vertical Shaft Engines from China, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) ……………………………………………………… 12

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

This Reply Brief[1] is filed on behalf of Sweet Harvest Foods ("Plaintiff"), Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc., and is joined by the National Honey Packers & Dealers Association ("Consolidated Plaintiffs") (collectively, "Plaintiffs") in support of Plaintiffs' previously filed Rule 56.2 motion for judgment on the agency record.[2]

As detailed in Plaintiffs' Opening Brief, the critical circumstances determination regarding certain imports of raw honey from the Socialist Republic of Vietnam issued by the United States International Trade Commission is not in accordance with law and is unsupported by substantial evidence. *See* Views of the Commission ("Majority Det."), CR No. 813 (May 31, 2022). None of the argumentation found in either Defendant's or Defendant-Intervenor's Response Briefs disturbs this reality, as the arguments rely on a flawed misreading of the critical circumstances provisions and endorse the Commission using outdated inventory data to assess whether the critical circumstances entries are likely to "undermine seriously" an antidumping duty order to be issued in the future. Defendant even submitted supplemental authority that actually contradicts its claimed statutory construction. Because Congress did not draft the statute to require such a ridiculous result, this Court should reverse the Commission and direct that it comply with the critical circumstances

---

[1] Documents in the administrative record are cited using the descriptions provided in the Index in the Court record of this proceeding, submitted by the Commission on September 21, 2022 (Dkt. 21, Sealed Confidential Administrative Record Index, "CR"; Dkt. 22, Public Administrative Record Index, "PR"). Per the instructions of the Court, there are no cross-reference cites to the Joint Appendix that will be submitted by the parties at the conclusion of briefing. Listed page numbers correspond to each individual document's PDF page numbers (and are not additive).

[2] Although all cases concerning the Vietnamese critical circumstances determination are consolidated into a single action, the NHPDA is represented by its own counsel, attorneys from White & Case LLP. The NHPDA supports the arguments made in the previously submitted Memorandum of Law and in this Reply Brief.

provision as written.

## II.    BOTH DEFENDANT AND DEFENDANT-INTERVENORS ADVANCE A STATUTORY CON-STRUCTION THAT IS CONTRARY TO THE PLAIN LANGUAGE OF THE CRITICAL CIRCUM-STANCES PROVISION AND THE LEGISLATIVE HISTORY

It is an odd and curious strategy for Defendant and Defendant-Intervenors to advance an argument based upon the plain reading of the statute while ignoring the actual words of the statute. For Defendant and Defendant-Intervenor to then follow up by submitting supplemental authority that actually contradicts their flawed misreading of the statute, however, takes "odd and curious" to an entirely new level.

The critical circumstances provision is found in section 1673d(b)(4)(A)(i). As stated therein, the Commission is tasked with making an exact finding, *i.e.*, "the final determination of the Commission shall include a finding as to whether the imports subject to {Commerce's} affirm-ative determination under subsection (a)(3) are *likely to undermine seriously* the *remedial effect* of the antidumping duty *order to be issued*." 19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added).

One would think that language as clear as this would end any disputes about the meaning of the statutory provision. The plain language of the statute, after all, not only exactly lays out what finding the Commission is required to make (whether any increased imports will undermine the "remedial effect of the antidumping duty order to be issued") but also the relevant level of harm ("serious"). In fact, as discussed in the next subsection, this Court itself, less than two months ago, underscored that this inquiry is by its very nature one required to look to the future, because the statute directs the Commission to evaluate "the remedial effect *of the antidumping duty order to be issued.*"

Yet in construing this statute, Defendants makes two errors:

- First, Defendant erroneously argues that the "critical circumstances period" (*i.e.*, the period covered by both the Department's and the Commission's critical circumstances

inquiry) somehow stretches from "April 2021 with the filing of the petitions … until suspension of liquidation in November 2021," even though both the statute, as well as the Department's own preliminary critical circumstances determination, correctly lay out the period as being ninety days, as correctly stated in Plaintiffs' Opening Brief.

▪ Second, Defendants rely on a flawed misreading that entirely ignores the most important portion of the critical circumstances provision: the Commission's obligation to determine whether the "remedial effect of the antidumping duty order to be issued" will be undermined, not the efficacy of the provisional measures already in place. Instead, Defendant urges a view of the statute that incorrectly focuses on the efficacy of the provisional measures, when the statute clearly directs the Commission to focus on whether the increased imports undermine the "remedial effect *of the antidumping order to be issued.*"

As detailed in the remainder of this Section, because Defendant's (and Defendant-Intervenor's) defense relies on a fundamentally flawed construction of the statute, the entirety of their argument fails.

### A.   The Statute Plainly States that the Entries "Subject to the Department's Affirmative" Critical Circumstances Finding Are Exactly the Same as the Entries Where Liquidation Is Suspended Ninety Days Early

In its Rebuttal Brief, Defendant repeatedly states that Plaintiffs "incorrectly maintain that … the Commission should only have considered imports during the 90-day critical circumstances period," which Defendant argues is incorrect because this supposedly "confuse{s} the 90-day retroactive application of duties with the entries subject to Commerce's finding of critical circumstances."[3] But a quick examination of the statute shows it is Defendant that is mixing things up, specifically by treating *the time period examined by the Department* when evaluating critical circumstances (which can change from case to case, in the Department's discretion) *with the actual entries that are the subject of the Department's critical circumstances finding* (which is fixed by statute).

---

[3] Def. Rebuttal Brf. at 2. Defendants repeat this allegation numerous times. *See*, *e.g.*, Def. Reb. Brf. at 7 ; *id.* at 8; and *id.* at 14-15.

The starting point of Defendant's analysis is correct: the statute does direct the Commission to examine the exact same entries that are "subject to the affirmative determination" by the Department, as stated in section 1673d(4)(A)(i). Thus, Plaintiffs agree with Defendant that the statute directs the Commission to make its critical circumstances finding based upon the same set of entries for which the Department issued an affirmative critical circumstances finding.

But after that point in the analysis, Defendant's statutory construction meanders into a flawed misreading of the statute. This is because Defendant fails to realize that when determining the exact entries that are "subject to the affirmative determination," it is important to distinguish between the *time period* examined by the Department when evaluating the increase in subject imports and the *exact entries* that are "the subject of" any critical circumstances finding.

Regarding the former, the statute leaves the time period to be examined up to the Department, stating only that Commerce should examine whether "there have been massive imports of the subject merchandise over a relatively short period." *Id*. § 1673d(a)(3)(B). Under the statute, the time period examined to determine whether subject imports have a "massive" increase can vary from case to case, depending upon how the Department chooses to proceed.

Consistent with this statutory language, in its Preliminary Affirmative Determination of Critical Circumstances, the Department stated as follows:

> As noted above, the "relatively short period" that we examine to determine whether there have been massive imports *normally* begins on the date the petition is filed and ends at least three months later. Furthermore, Commerce *may* consider the comparison period to begin at an earlier time if it finds that importers, exporters, or foreign producers had a reason to believe that proceedings were likely before the petition was filed. However, Commerce has previously considered a "relatively short period" beginning with the filing of the petition and ending with the preliminary determination.

Dep't of Commerce, "Raw Honey from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair Value Investigation," 87 Fed.

Reg. 2127, 2129 (Jan. 13, 2022) (emphasis added); *see also* 19 C.F.R. § 351.206(j) (giving the Department the discretion to redefine the "relatively short period" depending upon the relevant facts).

Thus, the Department has the discretion to set the time period for its examination of whether any increase in imports has been "massive." In most (but not all) cases, the Department's policy is to use evidence covering the time period that begins at the filing of the petition and lasting up until the suspension of liquidation. Even when the Department applies this time period, however, the Department may choose to flip the month of filing between the base and the comparison periods, depending on whether the petition was filed in the first or second half of a month. *See id.* (noting that the Department may or may not include the filing month in the base or comparison period, depending upon when within the month the petition was filed).

But it is erroneous to equate the time period examined to determine if any increased imports are "massive" with the exact entries that are "the subject of" the Department's critical circumstances finding. The "Suspension of Liquidation" portion of section 1673b – which the Department has no discretion to alter – details the exact entries that are "subject to the affirmative determination," by defining them as the entries beginning on "the date which is 90 days before the date on which the suspension of liquidation was first ordered." 19 U.S.C. § 1673b(e)(1)(B).

The Department correctly followed the statute in its critical circumstances determination. In its announcement of its affirmative critical circumstances determination, the Department directed that Customs suspend liquidation as follows:

> In accordance with section 703(e)(2)(A) of the Act, we are directing the U.S. Customs and Border Protection to suspend liquidation of any unliquidated entries of the merchandise under consideration from Vietnam entered, or withdrawn from warehouse for consumption, *on or after August 25, 2021, which is 90 days prior to the date of publication of the Preliminary Determination in the Federal Register.*

Dep't of Commerce, "Raw Honey from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair Value Investigation," 87 Fed. Reg. 2127, 2129 (Jan. 13, 2022) (emphasis added).

Thus, the Department acted entirely consistently with the statute. When choosing the time period to examine, the Department applied its normal practice to examine the time period between the filing of the petition up through suspension of liquidation to determine whether there was a "massive" increase in subject imports. But as for the entries that were the "subject to the affirmative determination," the Department issued a determination that applied to a precise set of entries, which are those falling within the ninety-day statutory period.

Indeed, this delineation between the entries that are examined by the Department and those that are the subject of the Department's preliminary and final determinations mirrors how the Department generally imposes provisional measures and final duties. In most cases, the Department uses a one-year period of investigation, which is the time period used by the Department to gather information to allow it to calculate the antidumping duty margin. No one would logically claim that just because the Department examines one year's worth of entries that this means that this entire years' worth of entries (which occurred before the case even was initiated) is the "subject of" of the Department's overall dumping finding. Instead, it is the entries for which liquidation is suspended that are the "subject of" the Department's overall dumping finding.

Against this background, it is apparent that Defendant has confused the time period analyzed by the Department to determine whether subject imports were "massive" (*i.e.*, the period between April of 2021 and November of 2021) with the actual critical circumstances entries that are "subject to the affirmative determination" (*i.e.*, the ones that were subjected to antidumping duties by virtue of the Department's affirmative critical circumstances finding). Thus, there is no

basis for Defendant to conclude that the Commission was supposed to analyze critical circumstances based on "imports … entering during a longer period {than ninety days}, the period between the filing of petitions and suspension of liquidation."[4] The reality is, under both the statute and as delineated in the Department's finding, the entries subject to the ninety days of retroactive duties *are exactly* the ones that are "subject to Commerce's finding of critical circumstances," and Defendant's attempts to argue to the contrary are based upon an entirely irrelevant time period, which is the one used by the Department to make one specific factual evaluation of whether increased imports are massive (which can even vary from case to case).[5]

>    **B.    The Statute, the Legislative History, and Recent Precedent of this Court Establish that the "Remedial Effect of the Order to Be Issued" Begins When the Order is Issued, Not When Provisional Measures Are Imposed**
>
>    **1.    The Statute and the Legislative History Both Direct the Commission To Evaluate Whether the "Antidumping Duty Order To Be Issued," Not the Provisional Measures Already in Place, Would be "Undermined Seriously"**

The second statutory construction error by Defendant concerns the issue of whether the Commission should examine the level of the critical circumstances inventories: (1) at the time that the suspension of liquidation occurs (*i.e.*, November 25, 2021, which is fairly close to the time period actually considered by the Commission majority); or (2) based on updated inventory and

---

[4] Def. Reg. Brf. at 8; *see also id.* at 2 "Plaintiffs incorrectly maintain that … the Commission should only have considered imports during the 90-day critical circumstances period" and that Plaintiffs have "confused the 90-day retroactive application of duties with the entries subject to Commerce's finding of critical circumstances."

[5] Defendant-Intervenors add one additional point, which is the claim that "Plaintiffs admit their argument is not based on law or precedent but urge the Court to accept it based on 'logic.' There is neither logic nor law to support Plaintiff's argument." Defendant-Intervenors' Reb. Brf. at 1. As shown in this section, Plaintiffs' statutory construction argument is based upon the words of the statute, the legislative history, the correctly applied critical circumstances determination of the Department, *and* logic.

other data found in the record for the final phase of the investigation (as urged by Plaintiffs). According to Defendant, the Commission does not need to look at *any* inventory data that is after the suspension of liquidation (November 25, 2021), because the "remedial effect of the order … began upon collection of duties in November 2021." Def. Reb. Brf. at 3.

This formulation ignores the plain language of the statute. As noted above, the Commission can issue an affirmative critical circumstances finding only if it determines that the critical circumstances entries are likely to "undermine seriously the remedial effect *of the antidumping order to be issued*." 19 U.S.C. § 1673d(b)(4)(A)(ii) (emphasis added).

As stated in this plain language, the focus thus is not on whether there will be any ill effects resulting from the critical circumstances entries during the conduct of the Commission's investigation. Rather, as stated in the provision's plain language, the focus is on the potential impact of those entries on the antidumping duty order to be issued – that is, will the imports undermine seriously the antidumping order's remedial effect. Further, the fact that the relevant inquiry involves whether any subject imports are "seriously undermining" the impact of an order to be issued only is reinforced by the legislative history, which states that the Commission is supposed to focus "on whether *an order's effectiveness* is undermined by increasing shipments *prior to the effective date of the order."* H.R. Rep. 103-316, Vol. I at 877) (1994) (Statement of Administrative Action) (emphasis added).

In the face of this plain language, which states that the focus of the inquiry has to be on the impact on "the antidumping order to be issued," Defendant attempts an obvious sleight of hand. According to Defendant, when the statute instructs the Commission to focus on whether the increased subject imports will undermine the "*antidumping order to be issued*," in fact the statute is

secretly telling the Commission to consider whether the increased imports will undermine the *provisional measures already imposed*. According to Defendant, it is permissible to equate the two because the "remedial effect of the order … began upon collection of duties in November 2021." Def. Reb. Brf. at 3.

But this flawed construction of the statute fails on its face. Congress was very aware of the difference between provisional measures (which go into place after the issuance of the preliminary determinations of the two agencies) and final duties (which only issue after both agencies have issued final, affirmative determinations). If Congress wanted the Commission to evaluate whether the efficacy of the provisional measures was being "undermined seriously," it would have so stated, instead of requiring that the Commission investigate whether an "antidumping duty order" would be undermined seriously.

Further, this misreading of the statute also requires that the words "to be issued" be ignored. Provisional measures are issued very early in an investigation – right after the issuance of the Department's preliminary affirmative determination. Thus, Defendant's formulation not only requires that one assume that Congress meant "provisional measures" when it wrote "antidumping duty order," but also when it wrote "to be issued" it in fact meant "already in place." If Congress meant to direct the Commission to evaluate whether the increased imports are "undermining seriously the provisional measures already in place," then it would have so stated.

In addition, Defendant's attempt to equate provisional measures with final antidumping duties ignores the evolution of how provisional measures have been imposed. For many years, provisional measures were treated quite differently from final duties, both in terms of the ability

of importers to post bonds instead of cash deposits (which has now been eliminated)[6] as well as the cap on the rate that can be applied to provisional measures (which still is in place). Because of these differences, Congress had every reason to be very careful in detailing when it was referring to provisional measures (which could be covered by cash deposits, and which were capped) and when it was referring to final duties (which were not subject to interest and were not capped). Because Congress was well aware of the differences in how provisional measures and final duties were treated, one would not expect Congress to use the phrase "antidumping duty order to be issued" as a short-hand reference that encompasses provisional measures as well.

Defendant-Intervenors also advance a similar, flawed reading of the statute, adding in claimed support based upon the statutory requirement that the Commission evaluate whether there has been "'a rapid *increase* in inventories of the imports.'" Defendant-Intervenors' Brf. at 4; *see id.* at 5. What Defendant-Intervenors ignore, however, is that the statute does not contain any statement regarding the timeframe for the comparison in inventories. Defendant-Intervenors claim that the assessment regarding whether the increase in imports is "rapid" must be made based upon 2021 inventory data, but this is entirely based upon the flawed statutory construction that the critical circumstances provision requires "an assessment of whether inventories increased prior to the suspension of liquidation." *Id.* at 4. Thus, this argument fails for the same reason that the overall statutory construction argument asserted by Defendant fails. Further, as detailed in the next subsection, the argument is inconsistent with this Court's opinion in *MTD Products.*

Finally, Defendant's attempt to use legislative history to rehabilitate its flawed reading of the statute also fails. According to Defendant:

---

[6] The Department provides a history of the differences in how provisional measures and final duties were treated on page 27,316 of its 1997 amendment to its rules. *See* Int'l Trade Administration, "Antidumping Duties; Countervailing Duties," 62 Fed. Reg. 28,296, 27,316 (May 19, 1997).

{I}n another context, when discussing the possibility of improvement in the condition of the industry due to the pendency of antidumping and countervailing duty investigations, the SAA recognizes the relief afforded by provisional measures. "The imposition of provisional duties, in particular, can cause a reduction in import volumes and an increase in prices of both the subject imports and the domestic like product." SAA at 854.

Def. Reb. Brf. at 29.

What Defendant ignores is that the quoted legislative history specifically mentions provisional measures, thereby demonstrating that when Congress wishes to refer to provisional measures, it does so. By contrast, when Congress means to refer to an order, it uses that precise term. Defendant cannot credibly claim that "an antidumping order to be issued" means the same as provisional measures already in place.

> ### 2. The *MTD Products* Determination Confirms that Defendant and Defendant-Intervenor Have Advanced a Flawed Statutory Construction

According to Defendant-Intervenors, a recent decision of this Court, in *MTD Products, Inc. v. United States*, Slip Op. 23-34 (Mar. 16, 2023)," "mirrors the approach" the Commission took in the Raw Honey determination, and supports affirming the Commission here. Further, in a Supplemental Authority filing, Defendant provides a copy of the determination, also arguing that the *MTD* determination supports the claim that "provisional measures provide remedial relief to the domestic industry before any antidumping or countervailing duty order is issued and that the antidumping or countervailing duty order is generally effective as of the date of provisional measures." Def. Notice of Supplemental Authority (Mar. 22, 2023) at 2.

The *MTD Products* decision, however, as well as the underlying Commission Determination, in fact shows the exact opposite. As shown therein, not only did the Commission consider the potential impact of any increased critical circumstances entries on U.S. sales that would occur long after the imposition of provisional measures, the CIT explicitly affirmed the Commission on

that basis. In other words, the Commission prevailed before this Court because it undertook exactly the analysis that it now claims it is precluded from undertaking.

In the underlying case of Small Vertical Shaft Engines from China, the data before the Commission showed there was a rapid increase in subject imports prior to the imposition of the provisional measures, Small Vertical Shaft Engines from China, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) at 50, which the Commission found created a "stockpile of imports." *Id.* at 51. Contrary to the claims of Defendant and Defendant-Intervenor, however, the Commission analyzed whether these entries would have an impact on *future* sales by the U.S. industry *in the 2021 growing season* – long after the imposition of provisional measures in August of 2020. As the Commission stated:

> The effect of the increase in imports was to create a large stockpile of imports prior to the imposition of provisional duties, at levels that were higher than all U.S. importers' annual end-of-year inventories from 2017 through 2019. These inventories were *** held by ***, the largest purchaser of SVSEs during the POI, and totaled *** units at the end of September 2020, a large volume relative to Zongshen's annual exports to the United States during the POI. *The surge in imports prior to Commerce's preliminary countervailing duty determination in August and the substantial buildup in inventories means *** has less need to buy SVSEs from domestic producers for the 2021 season*, and the record shows that subject import prices were among their lowest of the POI during the second and third quarters of 2020.284 *Further, these imports entered during the period where domestic producers and purchasers typically negotiate and set prices for engines delivered for the 2021 lawn mower season.*

*Id.* (emphasis added).

Further, the Commission stated that it was taking into account "that MTD and Toro entered new supply agreements with domestic producers in late 2020," *i.e.*, well after provisional measures were imposed on August 24, 2020. The Commission nonetheless concluded that despite entering into this contract, the critical circumstances entries would "serve as a disincentive to obtain additional supplies of SVSEs from domestic producers." *Id.* at 48 n. 266.

The Commission not only evaluated events *after* the imposition of provisional measures;

it also looked into the next season to determine whether the critical circumstances entries would have a post-order impact. Because the Commission concluded that there would be a long-term impact ("we find that this massive surge of imports and rapid inventory buildup is likely to protract the adverse impact of the imports subject to the affirmative critical circumstances finding"), it issued an affirmative critical circumstances determination. It was only after making the type of post-order analysis that it now claims is actually barred by the statute – and finding that the evidence supported a showing of a "protracted" post-order impact – that the Commission issued an affirmative critical circumstances determination.

Further, this Court endorsed this examination of post-liquidation evidence as a means of determining the likely impact of the increased subject imports in the post-order 2021 season. After favorably noting that the Commission had found that the surge in imports "meant that there would be less need for power tool manufacturers to purchase small engines for the next year's season" (*i.e.*, after any order would be issued), *MTD Products*, Slip Op. at 18, the Court also approvingly noted that the Commission was making a *prospective prediction about future events* (ones after the imposition of the order), not historical events (ones occurring during the investigation). As the Court stated:

> The statute … requires the Commission to assess whether subject imports "*are likely* to undermine seriously the remedial effect{s}" of the antidumping and countervailing duty orders "*to be issued*." 19 U.S.C. ss 1673d(b)(4)(A)(i) (emphasis added), 1761d(b)(4)(A)(i) (same). In other words, the Commission makes an informed judgment *in advance.* The court need not decide whether the import surge *did*, in fact, undermine seriously the orders' remedial effect because even if it did not, that fact would not invalidate the Commission's finding under the statute.

*Id.* at 20 (emphasis in original).

Both the Commission's approach (considering the impact of the increased imports on the next selling season, after the issuance of the order) and the terms of this Court's affirmance (endorsing the analysis and emphasizing that the Commission is statutorily required to analyze future

events "*in advance*" demonstrates how the Commission should have proceeded in this matter. The type of forward-looking analysis that resulted in an affirmance by the *MTD Products* Court is entirely absent in the present case, mandating the opposite result.

III.     **THE COMMISSION SHOULD HAVE EXAMINED EVIDENCE DEMONSTRATING THAT ALL OR NEARLY ALL OF THE CRITICAL CIRCUMSTANCES INVENTORIES WERE SOLD OFF BEFORE THE ISSUANCE OF THE ANTIDUMPING DUTY ORDER, AND THUS NOT IN A POSITION TO "UNDERMINE SERIOUSLY" THE "REMEDIAL EFFECT OF THE ANTIDUMPING DUTY ORDER TO BE ISSUED"**

As detailed above, Defendant's and Defendant-Intervenor's flawed construction of the statute as stating that the remedial effect of the order begins when provisional measures are imposed is inconstant with the plain language of the statute, its legislative history, and recent Court precedent. This failure impacts not only the statutory arguments raised by Defendant and Defendant-Intervenors; it also impacts the factual arguments raised by them as well, because their arguments assume that any factual information that post-dates the imposition of the provisional measures is irrelevant, because those provisional measures marked the "effective date of relief." *See* Def. Reb. Brf. at 3 (stating that "inventory data from October 2021 … were the most relevant inventory data" because the remedial effect of the order "began upon collection of duties in November 2021") and *id.* at 9 (stating that any inventory data after November of 2021 "would have been of limited relevant to the Commission's critical circumstances determination … because Plaintiffs' requested data  instead covered a period after the imposition of provisional duties").

As detailed below, all of the fact-based arguments raised by Defendant and Defendant-Intervenors either fail because they are based upon the flawed notion that only factual information up to the suspension of liquidation is relevant or are otherwise flawed.

A.      **Arguments that the Commission Did Not Need to Consider Any Data After the Suspension of Liquidation Rely on the Flawed Statutory Claim that the "Remedial Effect" of an Antidumping Duty Order Begins When Liquidation Is Suspended**

Throughout the factual sections of its Response Brief, Defendant relies on the flawed construction of the statute refuted in Section II. These include arguments relating to the undisputed fact that the levels of critical circumstances entries sharply declined, arguments regarding whether the critical circumstances entries were still in the supply chain, arguments regarding whether the Commission was required to examine end-user inventories of the critical circumstances entries, and arguments regarding whether it was reasonable for the Commission to fail to collect post-POI inventory data. *See* Def. Reb. Brf. at 30-35. According to Defendant, the failure of the Commission to gather, consult, or rely on any data after the suspension of liquidation is entirely proper, because the only basis to consult such data has to be "premised on the antidumping duty order not being effective before its issue date." *Id.* at 30. As Defendant concludes: "the Commission did not need to track those stockpiled inventories after November 2021. It knew that the October 2021 inventories would be sold after the order's effective date of relief in November 2021." *Id.*

As established above, however, the statute deliberately requires that the Commission evaluate evidence regarding whether the remedial effect of the order to be issued – not the provisional measures already in place – will be undermined. It necessarily follows that any arguments that are based on claims that the data after November 25, 2021 is irrelevant, because the remedial measures already are in place, fail as well.

B.      **The Record Contained Sufficient Inventory Data to Allow the Commission to Evaluate Whether the Critical Circumstances Entries Were Still in the Supply Chain or Had Been Consumed**

In addition to arguing that any data after November 25, 2021 is irrelevant, Defendant also advances a number of supposed reasons why such information could not or should not have been

gathered. In each case, however, the asserted rationales fail.

First, Defendant argues that due to statutory deadlines, and the need to issue the final determination on time, it was not possible to gather updated critical circumstances inventory data. Def. Reb. Brf. at 32-33. The fact that the Commission *actually did* seek updated critical circumstances data right around the time of the hearing (for Argentina), demonstrates that that this claim cannot be taken seriously.

Second, Defendant claims that because Plaintiffs did not request that the Commission staff collect 2022 inventory data or inventory data from end-users, Plaintiffs are now barred from seeking judicial relief. *Id.* at 19-20. The basis for this claim is unclear. As Defendant is well aware, questionnaires are only one source of factual information placed onto the record in a Commission investigation. Other sources include information provided in testimony (which is why witnesses are sworn in), information provided in briefs, information provided in response to Commission questions, and information otherwise submitted on the record by all the parties to the proceeding.

Here, importers and packers provided a full set of inventory data relating to inventory levels of the critical circumstances entries. It is uncontroverted that this information is on the record, as detailed in Plaintiffs' Opening Brief. While it would have been preferable for the Commission to gather such information as part of its questionnaire process, at no point in the preliminary phase of the investigation, or, indeed, well into the final phase, was the question of whether end-users were supposedly "stockpiling" critical circumstances entries raised. It was only at the time of the Pre-Hearing Brief – right before the hearing – that Petitioners inserted this allegation into the record. At this point, it was perfectly permissible for the importers and packers to submit their own data regarding critical circumstances inventory levels to rebut this new claim, because the record was still open. Any argument that Plaintiffs have failed to exhaust their remedies, when they placed

BUSINESS PROPRIETARY
INFORMATION
SUBJECT TO PROTECTIVE ORDER
REDACTED

information on the record on this very same issue, falls flat.

### C.    Defendant's Attempts to Rehabilitate the Commission's Deficient Factual Analysis Fail

In its Opening Brief, Plaintiffs noted that there also was other, non-inventory evidence that

was entirely ignored by the Commission. As stated therein:

> The Majority also erred by entirely ignoring two other key pieces of evidence:
> (1) information demonstrating that the U.S. industry was experiencing severe short-
> ages and the inability to supply customers at the end of the period of investigation;
> and (2) information demonstrating that the U.S. producers, which do not make raw
> honey that directly competes with the Vietnamese imports, would not be losing any
> sales opportunities at the bakers who rely on Vietnamese imports. In both cases,
> this obviously material evidence was not even mentioned by the Majority, provid-
> ing further proof that the Majority's determination was unsupported by substantial
> evidence.

Plaintiffs' Opening Brf. at 29.

Defendant disputes both of these points. In neither case, however, does Defendant over-

come the failure of the Commission to consider this key record information.

Regarding the severe shortages, Defendant claims that "{n}one of this evidence relied upon

by Plaintiffs to show 'severe shortages' even pertains to domestically produced honey." Def. Reb.

Brf. at 37. Defendant needs to re-read Plaintiffs' Opening Brief, which quotes the ITC Staff Report

as follows:

> When asked about supply constraints after the filing of the petition on April 21,
> 2021, 6 U.S. producers and 14 importers reported that they refused or declined to
> supply due to adverse climate conditions and increased logistics costs and delays.
> *Fifteen of 20 responding purchasers reported being declined supply after the filing
> of the petition citing {Petitioner} SHA's inability to supply dark amber honey*,
> COVID-related disruptions such as logistics, labor shortages, and lockdowns, and
> uncertainty in the market resulting from the petition. *Four purchasers reported that
> {Petitioner} SHA declared a force majeure and was unable to fill orders in 2021.*
> Purchaser [ ████ ] reported that following the filing of the petition, suppliers

have been unable to provide reliable or consistent "forward" pricing which has led to supply constraints.[7]

Thus, there was abundant evidence that U.S. producers had severe supply constraints and were turning down orders. When combined with information regarding record-low inventory levels, this evidence clearly was material, as it bore directly on the likelihood that the critical circumstances entries were already consumed and therefore were no longer in the supply chain. The fact that so many purchasers were unable to procure raw honey makes it exceedingly unlikely that these purchasers were sitting on inventories of critical circumstances entries. Yet the Majority does not even mention, let alone take into account, this obviously material information.

According to Defendant, it was proper for the Commission to ignore all the data regarding shortages because it was possible that raw honey that the U.S. industry could not supply might have been imported by the U.S. producers. *See* Def. Reb. Brf. at 35-37. This rationale for rejecting the probative value of this evidence, however, was not advanced by the Commission, which makes it an impermissible, post hoc argument. Further, even if the Commission had advanced this rationale, it would not matter. Regardless of whether the raw honey that the U.S. industry could not provide was domestically produced or imported, the fact that the U.S. market was experiencing severe shortages makes it highly unlikely that end users were sitting on any appreciable amount of critical circumstances entries. The information is highly relevant and should have been considered by the Commission.

Second, Defendant claims that uncontroverted evidence regarding how bakers generally cannot use the type of light-colored raw honey overwhelmingly produced by the U.S. industry

---

[7] Final Staff Report, CR 805 at II-9 (April 28, 2022). Both the ITC Pre-Hearing and Final Staff Report contain the same information; the cite provided herein is to the Final Staff Report.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER
REDACTED

when making baked goods could be ignored, because the Commission found elsewhere, in its overall material injury finding, that all forms of raw honey are part of the same broad market.

When evaluating material injury, the Commission only broadly considers whether various forms of the subject merchandise overlap with the domestic like product. This is because so long as there is a continuum of products, changes in the pricing of the subject merchandise can still impact the pricing of the domestic like product, even if the products do not compete head-to-head. Plaintiffs did not challenge the Commission's finding that there is general competition regarding different forms of raw honey for purposes of evaluating material injury, because it has no bearing on the critical circumstances determination.

Nonetheless, the fact that the Commission considered all forms of raw honey to constitute a single subject merchandise and a single domestic like product does not change that the degree of competition between Vietnamese imports (primarily composed of light amber and amber or darker raw honey) and the U.S. production (primarily composed of white or lighter or extra light amber) generally do not compete head-to-head. As noted in the Staff Report, many bakers prefer to use only amber or darker raw honey, due to its unique chemical makeup, which makes it suitable for baking. For these bakers, the Staff Report shows that the U.S. industry produces only [ ▮ ] percent amber and darker raw honey, whereas [ ▮ ] percent of Vietnamese imports are of this color. Final Staff Report at Table IV-17, IV-10. For bakers who can use light amber/amber or darker, the Staff Report shows that only [ ▮ ] percent of U.S. production falls into this color range, whereas [ ▮ ] percent of Vietnamese imports do. *Id.* Thus, the overwhelming majority of U.S. production is not suitable for use in the baking sector but is of the type used by consumers, whereas nearly all Vietnamese imports are useful only to the baking sector.

To be clear, the main reason why the Commission's affirmative critical circumstances determination needs to be remanded to the Commission is that the Commission failed to look at contemporaneous information that was on the record that demonstrated that there was at most only a small amount of critical circumstances entries that had not been consumed, meaning that such entries were not in a position to "undermine seriously" the "remedial impact of the order to be issued." The fact that any small amount of remaining critical circumstances entries that remained in inventory also do not compete head-to-head just provides an additional reason why any small remaining portion of such inventories would not be in any position to undermine the remedial impact of the order, let alone undermine it "seriously." The information thus was relevant, and the Commission should have considered it.

## IV.   CONCLUSION

As detailed above, Defendant's arguments rest entirely on a flawed misreading of the critical circumstances provision, all in an attempt to claim that the "remedial effect" of an order begins when provisional measures are applied. Congress, however, was well aware of the difference between provisional measures and final duties imposed under an order, and drafted the critical circumstances provision to require that the Commission evaluate whether the critical circumstances entries would undermine seriously the effect of the antidumping duty order to be issued – not the provisional measures already in place.

This Court should reject Defendant's and Defendant-Intervenors' flawed misreading of the statute and instead should remand this determination so that the Commission can make a determination that takes into account all relevant information on the record, including information demonstrating that all or nearly all of the critical circumstances entries had been consumed before the

end of the investigation, and thus were not in a position to undermine seriously the remedial effect of the antidumping duty order to be issued.

May 16, 2023

*/s/ Gregory Husisian*
Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300

Counsel for Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc.

**<u>Certification of Compliance with Chambers Procedure 2(B)(2)</u>**

The undersigned hereby certifies that the foregoing brief contains 6391 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitations of 8400 words for the Reply Brief set forth in the Court's Scheduling Order applicable to this case before the U.S. Court of International Trade.

Respectfully submitted,

May 16, 2023

*/s/ Gregory Husisian*
Gregory Husisian
Jenlain C. Scott
Foley & Lardner LLP
3000 K Street, NW, Suite 600
Washington, D.C. 20007
(202) 672-5300

Counsel for Sweet Harvest Foods, Export Packers Company Limited, Honey Holding I, LLP dba Honey Solutions, and Sunland Trading, Inc.